*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSHUA NYE and JUDY RAMIREZ,
                                        *Plaintiffs-Appellants,*

            *v.*                                              No. 05-3136

CSX TRANSPORTATION, INC.,
                                        *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01528—Lesley Brooks Wells, District Judge.

Argued: November 30, 2005

Decided and Filed: February 14, 2006

Before: SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert J. Fogarty, HAHN, LOESER & PARKS, Cleveland, Ohio, for Appellants. James R. Carnes, ANSPACH MEEKS ELLENBERGER, Toledo, Ohio, for Appellee. **ON BRIEF:** Robert J. Fogarty, Pasquale DiMassa, Jr., HAHN, LOESER & PARKS, Cleveland, Ohio, for Appellants. James R. Carnes, Robert M. Anspach, ANSPACH MEEKS ELLENBERGER, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

SILER, Circuit Judge. Plaintiff Joshua Nye was injured as a passenger of a car that collided with a train. Nye and his mother, Judy Ramirez (collectively referred to as "Nye"), sued railroad operator CSX Transportation, Inc. ("CSXT"), for negligently causing personal injury. Specifically, Nye brought various claims for negligence, spoliation of evidence, loss of consortium, and punitive damages.

Nye presents three overarching questions for this court to decide: (1) whether his adequacy of warning device claim is preempted by federal law, (2) whether summary judgment was proper on his negligence claims relating to adequacy of visibility of the train cars and railroad crossing, and

---

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

(3) whether summary judgment was proper on his spoliation claim. We hold that Nye's first claim is preempted by federal law. *Norfolk So. Ry. Co. v. Shanklin*, 529 U.S. 344 (2000). His remaining claims fail to present genuine issues of material fact, and no reasonable jury could find for Nye. Therefore, the district court's grant of summary judgment is affirmed.

## FACTS

On July 2, 2000, Larry Bishop attended a gathering with friends in a field in Wood County, Ohio. Between 4:00 and 4:30 a.m. he decided to move his classic 1968 Mustang automobile because people were leaning on it. Nye accompanied Bishop because he wanted to take a ride in Bishop's car. Originally, Bishop only intended to circle around the field and park the car by Hough Road away from everyone at the party. Bishop agreed to take Nye for a ride, and pulled out of the field to the left on Hough Road. As he approached a stop sign at the intersection of State Route 18 and Hough Road, just south of the Hough Road railroad crossing, Bishop was unable to stop his car. He applied the brakes to no avail and continued past the stop sign through an intersection. At some point he noticed passing train cars and attempted to swerve to the left, but he was unable to avoid collision with the side of the CSXT train. Bishop impacted the train at the seventh and eighth railroad cars. Although it is not clear whether Nye jumped out of the car to avoid the accident or was thrown by force out of the car, he was dragged by the train, and sustained severe injuries that required amputation of both of his legs.

One of Bishop's friends, Cole Buchanan, was attending the party in the nearby field. He ran to the scene of the accident and helped remove Bishop from the car as the train continued moving. Buchanan stated that the "car would move as each railway car went by," and that the train was traveling east toward North Baltimore, Ohio. The conductor of the train, B.A. Babbitt, and the engineer, R.L. Heinert, did not realize that the train had been struck.[1]

## PROCEDURAL HISTORY

Under 28 U.S.C. § 1332(a)'s grant of diversity jurisdiction, Nye sued CSXT. He alleged that CSXT proximately caused the collision by (1) inadequate warnings at the Hough Road crossing; (2) insufficient lights or reflector strips on train cars; (3) failure to perform a diagnostic review or safety study of the crossing; (4) defective design and insufficient visibility of the crossbuck sign at the crossing; (5) inadequate pavement markings; (6) failure to sound an adequate and audible warning as the train approached; (7) failure to avoid the hazards presented by the crossing and to operate the train within applicable speed restrictions; (8) defective design, maintenance, and construction of the Hough Road Crossing; and (9) negligent operation of the train as it approached and passed through the Hough Road crossing. In response, CSXT argued that federal law preempts "in whole or in part, by federal and/or state law, including but not limited to, the Federal Rail Safety Act, 45 U.S.C. § 421, *et seq.*, and Federal Rail Safety Act, 23 U.S.C. §§ 4010-4404."

The district court provided two written decisions. First, it found that federal law preempted Nye's state tort claim based on alleged inadequacy of the warning devices at the Hough Road crossing. It later granted summary judgment for CSXT, finding that "no reasonable jury could conclude that CSXT's conduct contributed to, let alone caused, this accident and CSXT is entitled to summary judgement on [negligence]." It found proximate causes of the collision were brake failure and driver's error. In addition, it granted summary judgment on Nye's spoliation claims. The court concluded that because the negligence and spoliation claims fail, summary judgment is also appropriate for Nye's loss of consortium and punitive damages claim.

---

[1]Babbitt and Heinert were originally named as defendants, but they were dismissed from this action.

## OHIO CROSSBUCK PROGRAM

In 1993, the Ohio Department of Transportation ("ODOT") submitted a proposal to the U.S. Department of Transportation, Federal Highway Administration ("FHWA") to study the effectiveness of a new, experimental Buckeye Crossbuck in reducing accidents at public, passive grade crossings in Ohio. Based on this proposal, ODOT developed the Ohio Buckeye Crossbuck Program (the "Program"), a federally funded program intended to evaluate new crossbuck designs and to improve grade crossings. Funded 100% by the federal government, the Program involved the installation of either an upgraded Standard Crossbuck or an experimental Buckeye Crossbuck.

Under the Program, Buckeye Crossbucks were placed at passive crossings bearing even numbered DOT identification numbers while upgraded Standard Crossbucks were installed at passive crossings with odd numbered DOT identification numbers. Standard Crossbucks are black-and-white X-shaped signs that read "RAILROAD CROSSING." The upgraded Standard Crossbucks were reflectorized. The Buckeye Crossbuck is a Standard Crossbuck with red lettering, reflective tape on the blades, reflective sheeting on all four sides of the post, and a new sign mounted on the crossbuck's post which read "YIELD" in red lettering and a white background.

Later in 1993, CSXT and the State of Ohio entered into an agreement to cooperate in a demonstration project to evaluate the relative safety improvements generated by the new Buckeye Crossbuck versus an upgraded Standard Crossbuck. Under the agreement, CSXT was "to provide all labor, equipment, tools and materials" to install the crossbucks at all passively guarded CSXT grade crossings in the State of Ohio but would be fully reimbursed by the state. The State of Ohio received the funding by which it reimbursed CSXT pursuant to the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). Following the installation of the crossbucks under the agreement, CSXT became the owner of the crossbucks and was required to "maintain them in good condition, as required by statute at company cost and expense."

As a part of the federally funded Program, CSXT installed two upgraded Standard Crossbucks at the Hough Road crossing in 1995. While these crossbucks were installed pursuant to approval granted by the FHWA, the FHWA itself made no determination that a standard crossbuck at the Hough Road crossing would be adequate. In fact, the first determination of the adequacy of warning devices at the Hough Road crossing was not made until 2000 when the State of Ohio, through a diagnostic team comprised of individuals from the Ohio Rail Development Commission, CSXT, the Public Utilities Commission, and local highway authorities, recommended that the crossing either be closed or flashing lights and roadway gates be installed. Ultimately the FHWA paid $271,756.85 for the installation of Standard Crossbucks and Buckeye Crossbucks at CSXT's crossings in the State of Ohio pursuant to the Buckeye Crossbuck Program, representing 100% of the total installation cost.

## ANALYSIS

### I. Preemption

This court reviews questions of federal preemption *de novo*. *Shanklin v. Norfolk So. Ry. Co.*, 369 F.3d 978, 985 (6th Cir. 2004). The Supremacy Clause of the Constitution authorizes federal law to preempt conflicting state law. U.S. CONST. art. VI, cl. 2. However, intent to preempt state law must be "the clear and manifest purpose of Congress." *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663-64 (1993). Congress can express its intent to preempt state law through explicit statutory language or implicitly through the statute's structure and purpose. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992).

In 1970, Congress enacted the FRSA and conferred upon the United States Secretary of Transportation the authority to preempt state law relating to railroad crossing safety. *See Shanklin*,

529 U.S. at 347. The express preemption provision of the FRSA provides for uniformity of law between the states to enact railroad safety laws until the Secretary of Transportation through the FHWA addresses the issue. 49 U.S.C. § 20106.[2]

Enacted in 1973, the Highway Safety Act created the Federal Railway-Highway Crossings Program to provide funding for the "cost of construction projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). Through the promulgation of regulations, the Secretary of Transportation addresses the adequacy of warning devices for railway crossings in 23 C.F.R. §§ 646.214(b)(3) and (4).[3]

In *Shanklin*, the United States Supreme Court resolved whether 23 C.F.R. §§ 646.214(b)(3) and (4) preempted state tort law claims for failure to maintain adequate warning devices at railroad crossings. 529 U.S. at 352. Generally, the Court stated that the scope of the regulations applies to "any project where Federal aid funds participate in the installation of the devices." *Id.* at 354 (citing 23 C.F.R. § 646.214(b)(3)(i)). The Court held:

> Sections 646.214(b)(3) and (4) therefore establish a standard of adequacy that "determine[s] the devices to be installed" when federal funds participate in the

---

[2] 49 U.S.C. § 20106 provides:

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

[3] (b) Grade crossing improvements.

(1) All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.

(2) Pursuant to 23 U.S.C. § 109(e), where a railroad-highway grade crossing is located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of the existing roadway, the crossing shall not be opened for unrestricted use by traffic or the project accepted by FHWA until adequate warning devices for the crossing are installed and functioning properly.

(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

crossing improvement project. *Easterwood,* 507 U.S. at 671. If a crossing presents those conditions listed in (b)(3), the State must install automatic gates and flashing lights; if the (b)(3) factors are absent, (b)(4) dictates that the decision as to what devices to install is subject to FHWA approval. See *id.* at 670-671. In either case, § 646.214(b)(3) or (4) "is applicable" and determines the type of warning device that is "adequate" under federal law. As a result, once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation "displace[s] state and private decision making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Id.* at 670.

*Shanklin*, 529 U.S. at 354 (discussing *Easterwood*, 507 U.S. 658) (some citations omitted).

In a somewhat similar set of facts to this case, the Ninth Circuit addressed preemption after *Shanklin* in *Lee v. Burlington Northern Santa Fe Railway Co.*, 245 F.3d 1102 (9th Cir. 2001). In *Lee,* a pickup truck collided with the second and third car of a train at a grade crossing. The plaintiff filed a state tort law claim against the railroad for negligent failure to install active warning lights to make the crossing safe under Montana law. *Id.* at 1105. The crossing was guarded by reflectorized crossbucks, which were installed with federal funding approved by the FHWA. The district court denied summary judgment reasoning that since the Secretary of Transportation did not expressly approve the crossbuck, the plaintiff's state claim was not preempted. The Ninth Circuit opined that *Shanklin* "makes clear that once the FHWA has funded a crossing improvement and warning devices are actually installed and operating, federal regulations displace state and private decision making authority." *Id.* at 1106 (citing *Shanklin*, 529 U.S. at 354).

In *Strozyk v. Norfolk Southern Corp.*, a plaintiff claimed that a railroad was negligent, among other things, for inadequate warning devices at grade crossings. 358 F.3d 268 (3d Cir. 2004). The Third Circuit noted that the district court's dismissal of plaintiff's claim that crossbucks were inadequate was not challenged by the plaintiff and was properly dismissed. However, the court considered the dismissal of all claims arising out of the grade crossing accident an overly broad application of § 646.214(b) and allowed the general maintenance of a safe grade crossing claim and limited sight distance claims to continue. Again *Shanklin* was discussed as settling "a division among the Circuit Courts of Appeals by clarifying that an individualized determination ensuring the adequacy of the warning devices at a particular crossing is not a necessary precondition to preemption." *Id.* at 275 (citing *Shanklin*, 529 U.S. at 356).

Nye raises the following arguments against preemption of his adequacy of warning negligence claim: (1) preemption does not apply because the warning devices were experimental; (2) the Secretary of Transportation did not make an adequacy determination for particular improvements at railroad crossings to protect the monitoring public; (3) the Program is not an improvement project qualifying for preemption; (4) the FHWA did not approve the Program; and (5) summary judgment is not proper because a genuine issue of preemption exists.

Nye's arguments are clearly at odds with *Shanklin*. It is indisputable that the Program was federally funded by the FHWA and ISTEA. Most significant is the fact that Nye concedes the use of federal funds and, as *Shanklin* makes clear, federal funding plus installation of a crossbuck is all that is necessary for preemption under the FRSA. 529 U.S. at 354. It is not a requirement of preemption that the Secretary of Transportation through the FHWA make an adequacy determination as to particular warning devices. *Strozyk,* 358 F.3d at 275. In essence, the FHWA's approval, albeit tacit approval, is its federal funding of the Ohio Crossbuck Program with funding through the ISTEA. Nye's contentions that preemption does not apply because the sign was experimental or that it was not an improvement project have no impact on the fact that the crossbucks were placed on the Hough Road crossing with federal funds by CSXT railroad in 1995, and that is all that is required for preemption. Finally, Nye's argument against summary judgment on the issue of preemption is

unfounded since preemption by the FRSA is purely a question of law. *Tyrrell v. Norfolk S. Ry. Co.,* 248 F.3d 517, 520 (6th Cir. 2001); *GTE Mobilenet v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997). Therefore, Nye's negligence claim based on inadequate warnings is preempted. *Shanklin*, 529 U.S. at 356.

## II. CSXT Negligence

This court reviews the district court's grant of summary judgment *de novo*. *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir. 2003). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A mere scintilla of evidence in support of the nonmoving party will not be sufficient. *Id.* In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52. A court's duty is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Diversity jurisdiction requires a federal court to apply the substantive law of the state in which it sits. *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 566 (6th Cir. 2001). However, federal courts may apply their own procedural rules. *See Miller v. Davis*, 507 F.2d 308, 313 (6th Cir. 1974). Therefore, we apply Ohio negligence law and our summary judgment standard. As Nye's negligence claims based on inadequate warnings are preempted, his negligence claims as to inadequate train visibility and reflectorization will be reviewed.

Under Ohio law, in order to defeat a motion for summary judgment on a negligence claim, a plaintiff must establish that a genuine issue of material fact as to whether the defendant: (1) owed a duty of care to the plaintiff; (2) breached that duty; and (3) the breach of that duty proximately caused (4) injury to the plaintiff. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 693 N.E.2d 271, 274 (Ohio 1988). The existence of duty is a legal question for the court to determine. *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989).

Thus, we review *de novo* to decide whether a reasonable jury could find that (1) CSXT has a duty to make sure that its train cars are visible, (2) it breached that duty, and (3) Bishop's inability to perceive the train was a proximate cause of the accident. It is well settled that CSXT owes a duty of ordinary care to protect the safety of motorists. *Matkovich v. Penn Cent. Transp. Co.*, 431 N.E.2d 652, 656 (Ohio 1982). If not preempted by federal law, "[a] railroad's minimum statutory duty is to erect crossbuck signs at each crossing pursuant to R.C. [OHIO REV. CODE] § 4955.33, and this duty may be enlarged under common law to include additional warnings given special circumstances." *Id.* at 655-656. As to the duty of a driver of an automobile approaching a railroad crossing in Ohio, that driver owes a duty of care to avoid a collision. *Barger v. Chesapeake & Ohio Ry. Co.*, 590 N.E.2d 1369 (Ohio Ct. App. 1990); see also OHIO REV. CODE § 4511.62 (general duty to stop at stop sign before railroad crossing).

### 1. Bishop's testimony

Nye asserts that Bishop's testimony that he did not see the train until he was less than one car length away established a genuine issue of fact as to CSXT's negligence. Specifically, Nye claims that Bishop could have avoided the collision if he could have seen the train. Nye concludes that Bishop's lack of notice of the train presents a genuine issue of material fact as to CSXT's negligence because the crossing was dark, there was no illumination at the crossing or on the train, and there were no reflectors on the train. Nye cites Ohio law for the proposition that discernability

is an issue for the jury. *Sharp v. Norfolk & W. Ry. Co.*, 522 N.E.2d 528, 530-31 (Ohio 1988); *Case v. Norfolk & W. Ry. Co.*, 570 N.E.2d 1132, 1137 (Ohio App. 1988).

CSXT argues that Bishop's statement that he could not have seen the train does not withstand summary judgment because he also admitted that he was not looking for a train. Therefore, CSXT proposes that discernability is not a jury issue. CSXT suggests that even if the crossing was illuminated by lights or the train had reflector strips, it would have made no difference in the outcome of the case because he was not looking for a train. Moreover, Bishop admitted that he was familiar with the railroad tracks, he knew trains traveled over those tracks, and he knew there was a crossbuck at the crossing. Bishop felt the collision was caused solely by his brake failure and not CSXT's conduct.

Deciding whether Bishop could have steered his car to safety with more warning required speculation on the part of Bishop. At some point of visibility, Bishop likely would have been able to steer the vehicle to safety. However, Bishop knew the train was crossing, and expected his car to stop, but the car was unable to stop. It is conceivable, that upon seeing the train earlier, he could have realized his brakes were malfunctioning and taken appropriate action. However, it is also conceivable that Bishop would have continued up and until he reached the intersection, expecting to stop, only to realize his brakes would not stop him safely.

The issue of proximate cause usually is a question of fact. *Whiteleather v. Yosowitz,* 461 N.E.2d 1331 (Ohio Ct. App. 1983). However, if the plaintiff's evidence on the issue of proximate cause requires mere speculation and conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment. *Renfroe v. Ashley,* 150 N.E.2d 50, 50-51 (Ohio 1958). Nye's support is conjecture and based upon "what if" deposition questions. Although discernability may very well be a jury issue, the portions of Bishop's testimony cited by Nye are nothing more than speculation. Moreover, Bishop repeatedly refers to his brakes as the cause of the accident. *See*, *e.g.*, *Ayoub v. Nat'l R.R. Passenger Corp.*, 76 F.3d 794, 796 (6th Cir. 1996) (holding where driver's own negligence proximately caused train-car collision, no reasonable jury could return a verdict against railroad). As Bishop was the driver and repeatedly stated that visibility of the train would not have mattered, no reasonable jury could conclude that CSXT proximately caused this accident.

### 2. Dr. Heathington's testimony

Nye contends the district court committed reversible error by weighing the testimony of his expert, Dr. Kenneth Heathington. He posits that Dr. Heathington's testimony established that CSXT caused the collision and Nye's damages by breaching its duty of ordinary care in the following ways: (1) maintaining improper vertical grades; (2) failing to illuminate the Hough Road crossing; or (3) failing to place reflective materials on the trains. Dr. Heathington concluded that if CSXT had taken any series of fundamental safety steps, this accident could have been prevented. In response, CSXT argues that Dr. Heathington's opinions are conclusory and there was no evidence to support his irrelevant theories.

Dr. Heathington submitted an affidavit and report of his findings. The district court considered Dr. Heathington's opinion directly contrary to eyewitness reports and at odds with sworn statements and depositions. This court has held that status as an expert does not relieve the nonmoving party of the burden of rebutting summary judgment. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) ("[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts."). Consequently, this court cannot rely solely on the expert's word. *Id.*

Dr. Heathington's report is rife with unfounded conclusions about national railway safety problems that are for the most part irrelevant to resolution of this case. However, it concluded that

CSXT created Bishop's perception problem by breaching its duty of ordinary care by failing to illuminate the Hough Road crossing and failing to place reflective materials on its train. Dr. Heathington stated that nighttime collisions are a result of trains not "emitting light or else reflecting the light coming from some other source back toward" drivers and concluded that the accident would not have occurred had CSXT adopted countermeasures to overcome Bishop's inability to perceive the train. These concerns did not arise in this case, because Bishop was the driver and repeatedly stated that visibility of the train would not have mattered. On that basis, no reasonable jury could conclude that CSXT or the visibility of its trains proximately caused this accident, irrespective of Dr. Heathington's report.

### 3. Brake failure

Nye argues that the district court erred by relying on Bishop's testimony as conclusive proof of brake failure. He claims that the physical proof is inconsistent with brake failure and creates a genuine issue of material fact as to Bishop's inability to perceive the train. He notes that CSXT's Assistant Trainmaster Joseph Tupa investigated the collision and found "no evidence or information whatsoever that there was any problems with [Bishop's] brakes." The deposition shows Tupa had no knowledge of brake problems. During his deposition, CSXT's Claims Manager Aughenbaugh stated that he pressed the brake pedal and felt that it was firm. When asked by counsel whether he had any evidence that the brakes were not working that night, Aughenbaugh responded, "The only evidence that I'm aware of, that I've seen anyway, is Mr. Bishop's statement that the brakes weren't working." He also stated that he was not aware of any evidence to the contrary.

Nye asserts that two affidavits from experts show undisputed evidence that the brakes were functioning. One affidavit appears to be a report of a brake inspection of the Mustang. The report concludes that the brake system of Bishop's Mustang "is in operational condition and no failures were found during this inspection." The second affidavit is a letter from Joseph M. Praha, Ph.D., an engineering consultant, reporting the test results of the previous brake test. He wrote to Nye's counsel:

> Tests were made that established that with reasonable engineering and scientific certainty that braking system is in working order. There is no evidence of leakage of brake fluid from any of the wheel cylinders, the master cylinder or any of the connecting piping. Every wheel exhibited braking action with shoes moving in response to peddle depression.

Throughout his deposition, Bishop consistently highlights that the cause of the accident was the failure of his brakes. The inspection by the CSXT claims manager was cursory and only stated that the pedal was firm, and the other evidence was a report of a brake examination occurring a few days later. In any event, based on the evidence, we agree with the district court's ruling that CSXT's alleged negligence was not a proximate cause of the accident. Driver error and/or brake failure was the sole cause in fact for the collision. No reasonable juror could rule otherwise.

### 4. Legal duty to provide audible warning

Nye argues that the train engineers did not comply with the legal duty to provide audible warnings. Ohio law requires that train personnel sound a whistle at a distance of at least 80 rods and not further than 100 rods from a crossing, and ring a bell continuously until the engine passes the crossing.[4] OHIO REV. CODE § 4955.32. Bishop stated that he never heard a whistle at the Hough Road crossing, but he stated that his car engine was very loud. In addition, CSXT Claims Manager Aughenbaugh stated in his deposition that the event recorder that would log the number of whistle

---

[4]A rod is a traditional unit of distance equal to 5.5 yards or 5.0292 meters.

blows "did not record anything from beginning to end." Nye posits that whether Bishop's engine was too loud and drowned out the whistle is a question of fact for the jury. In addition, he contends that a whistle post, a sign to inform the train crew to sound the whistle, was not in place near the Hough Road crossing.

The evidence is clear that the impact was not with the lead engine and that Bishop collided with the seventh and eighth cars. As the engine had passed by the Hough Road crossing and was 500 feet in front of the location of impact, the engineer was no longer under a duty to sound the whistle. The train crew testified that the audible warning devices were activated. Once the engine has passed the crossing, the duty to sound audible warning devices ceases.[5] OHIO REV. CODE §§ 4955.32; 4999.04. The only evidence is that the whistle was activated prior to passing through the crossing. The presence of the whistle post does little to create a genuine issue regarding CSXT's negligence.

Failure to hear a train whistle is not sufficient to create a material issue of fact as to CSXT's negligence. *Lintner v. Norfolk & W. Ry. Co.*, 694 N.E.2d 140, 142 (Ohio Ct. App. 1997) ("Testimony of a witness that he or she either heard a train sound its whistle ("positive testimony") or did not hear a train sound its whistle ("negative testimony") prior to a collision is not probative unless the witness was in a position to know whether the whistle was sounded or actually hear the whistle being sounded."). In the end, there is positive testimony in the record by the train crew that the whistle sounded, while Nye presents only speculation that there was no whistle. *Id.* Accordingly, there is insufficient evidence to create a genuine issue of material fact.

### 5. Duty to maintain a proper lookout

Nye claims that there was no evidence that either an eastbound or westbound train crew saw Bishop's car approaching. He requests that we infer that the lack of eyewitness testimony that a car was approaching demonstrates a breach of the duty to maintain a proper lookout. The district court found that "no facts and no law support the Nye['s] claim that the train crew failed to maintain a proper lookout." The Supreme Court of Ohio discussed the duty to maintain a lookout as follows:

> It is the duty of a locomotive engineer to keep a lookout on the track ahead of the train. If, while doing so, his eye takes in a person approaching the track, he may assume that such person will keep away from the track until the train passes, but when it becomes evident that such person will not keep off the track it becomes the duty of such engineer to use ordinary care to prevent injury to such person.

*Cates v. Consol. Rail Corp.*, 653 N.E.2d 1229, 1237 (Ohio Ct. App. 1995) (noting that the law places upon the engineer the duty only to look out for persons or things "upon the track" ) (quoting *New York, Chicago & St. Louis R.R. Co. v. Kistler*, 64 N.E. 130 (Ohio 1902)).

There is no evidence to refute the engineer's testimony that he was watching for pedestrians and that he would have seen automobile headlights. Moreover, he also stated that he did not see or

---

[5] OHIO REV. CODE § 4999.04

A) No person in charge of a locomotive shall do the following:
(1) Fail to bring the locomotive to a full stop at least two hundred feet before arriving at a crossing with another track, or proceed through the crossing before signaled to do so or before the way is clear;
(2) When approaching a grade crossing, fail to sound the locomotive whistle at frequent intervals, beginning not less than thirteen hundred twenty feet from such crossing and continuing until the locomotive has passed the crossing.
(B) Whoever violates this section is guilty of a misdemeanor of the fourth degree. If violation of this section causes physical harm to any person, whoever violates this section is guilty of a misdemeanor of the third degree.

feel anything hit the train. Similar to the previous issue, Nye has presented no evidence to refute this testimony other than speculation. *Cates*, 653 N.E.2d at 1237.

### 6. Identity of the train involved in the accident

Nye claims that there is a genuine issue with respect to the identity of the train involved in the accident. During his testimony, Dr. Heathington reconstructed a collision scenario involving a westbound train traveling on northbound tracks making the first impact with Bishop's car rather than an eastbound train on southbound tracks. Dr. Heathington's safety analysis report supports the position that Bishop's car struck a westbound train, but that the eastbound train Q38201 was also involved.

The district court noted that Nye recently disputed that Bishop's car struck an eastbound train and insisted that Bishop's car hit a westbound train. The district court requested that parties submit either a factual stipulation identifying the train involved in the accident or separate statements identifying the train allegedly involved. CSXT filed statements identifying as indisputable the involved train as the eastbound train Q38201. Nye did not respond. Nye now claims that his stipulation was impossible due to spoliation of evidence.

Despite Nye's assertions, all eyewitness testimony refutes this claim. Bishop testified that he struck the side of the eastbound train and that the train was moving from left to right. Cole Buchanan, who had attended the same field party as Bishop and Nye, testified that he ran to the scene immediately after the collision and that he saw the eastbound train still crossing Hough Road at the No. 2 main. The Wood County Sheriff's traffic crash report from the scene indicated that the train was traveling east on the No. 2 main. After being notified of the accident, the eastbound train crew inspected the train and discovered damage to the south side of the rail cars. Conductor Babbitt's train inspection and photographs showed white paint scrapes from Bishop's Mustang to the seventh, eighth, and ninth rail cars of eastbound Q38201. Physical evidence showed that blood and tissue were found east of the crossing between the rails of, and south of, the No. 2 main, starting three railroad ties east of the crossing and ending twenty ties east of the crossing.

Dr. Heathington's report asserts that if the train was traveling east then the damage should not have occurred to the right side of a northbound car, and therefore the damage must have been caused by a westbound train. However, Bishop stated that he swerved to the left, and Nye fails to present direct contradiction to any of these statements.

## III. Spoliation of Evidence

Nye alleges that CSXT willfully destroyed evidence critical to its case. The only potentially viable claim of spoliation relates to radio communications between CSXT dispatchers and the train crew. Additional unsubstantiated claims of spoliation related to the measurements of blood stains and human tissue near the tracks, measurements and analysis of paint scrapes, conductor reports from trains traveling in both directions around the time of the collision, defect detector data, and the damaged or dragged ballasts. Dr. Heathington's report and affidavit stated "[a] lot of information which is needed to fully determine the way in which the accident in question occurred with reasonable engineering certainty was simply not recorded or at least not reported," and "CSXT intentionally destroyed or failed to preserve evidence with the intent to disrupt."

CSXT claims that it complied with Nye's requests. However, it claims that audio communications, recorded and stored in the Jacksonville, Florida office are maintained for 30 days and then the tapes are recycled in accordance with CSXT's internal retention policy and "normal railroad practice." CSXT maintains that the evidence of the train crew actions shows that there was no notice of the collision and therefore there were no dispatch communications. Because of this, CSXT did not request that the audiotape be retained longer than its normal retention policy.

Moreover, CSXT maintains that Nye never formally or specifically requested production of the audio tapes. Nye did submit a letter to CSXT's Claims Manager Aughenbaugh on February 15, 2001, which CSXT characterizes as an overly broad request. CSXT claims it complied by turning over train movement information that it considered to be dispatcher records under its jargon. In addition, CSXT asserts this request arrived seven months after the accident of July 2, 2000, and one and a half years prior to the filing of this lawsuit.

In order to sustain a prima facie claim for spoliation of evidence, the following elements must be established: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993).

With sufficient evidence documenting how the accident occurred, it is highly unlikely that audiotapes–if in existence–would show anything different. There is no genuine issue of material fact of spoliation based on the speculative testimony of an expert witness. Although the threat of pending litigation seems possible as a result of any accident, CSXT has put forth unrebutted evidence that audiotapes were destroyed in accordance with its tape retention policy. It is also dispositive that the tapes were destroyed before Nye made his discovery request and before the case was filed. Nye has not demonstrated willful destruction. Therefore, summary judgment was proper.

AFFIRMED.