*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0449p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ADRIAN & BLISSFIELD RAILROAD COMPANY,
　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

VILLAGE OF BLISSFIELD,
　　　　　　　　*Defendant-Appellant.*

No. 07-1664

>

Appeal from the United States District Court

for the Eastern District of Michigan at Detroit.

No. 06-10137—Robert H. Cleland, District Judge.

Argued: April 23, 2008

Decided and Filed: December 18, 2008

Before: MOORE and CLAY, Circuit Judges; SCHWARZER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael M. Wachsberg, PEDERSEN, KEENAN, KING, WACHSBERG & ANDRZEJAK, Commerce Township, Michigan, for Appellant. Charles E. Kovsky, CHARLES E. KOVSKY ASSOC., Livonia, Michigan, for Appellee. **ON BRIEF:** Michael M. Wachsberg, PEDERSEN, KEENAN, KING, WACHSBERG & ANDRZEJAK, Commerce Township, Michigan, for Appellant. Charles E. Kovsky, CHARLES E. KOVSKY ASSOC., Livonia, Michigan, David E. Sims, FINKEL, WHITEFIELD, SELIK, Farmington Hills, Michigan, for Appellee.

_____

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

1

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  The Village of Blissfield ("the Village") appeals the judgment of the district court granting declaratory relief to Adrian & Blissfield Railroad Company ("the Railroad").  After a bench trial, the district court held that the Interstate Commerce Commission Termination Act ("Termination Act" or "ICCTA") of 1995, 49 U.S.C. §§ 10101-16106, preempted a Michigan statute requiring the Railroad to pay for pedestrian crossings installed by the Village across the Railroad's tracks and sidewalks near the Railroad's property.  For the following reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

Adrian & Blissfield Railroad Company is a short-line railroad based in Lenawee County, Michigan.  The Railroad owns approximately 2.5 miles of track that run through the Village, and, although the Railroad does "not cross state lines[,] . . . the traffic that originates or terminates on [the] railroad crosses state lines."  J.A. at 110 (Dobronski Test. at 17:12-14).  The Railroad also has a small depot in the Village, located on US 223.

The Village Administrator, James Wonacott, testified that in 2003 and 2004 the Village implemented a sidewalk-construction program pursuant to Mich. Comp. Laws § 462.309(6).  The 2003 project derived from the Village's concern that "without the benefit of a sidewalk or dedicated pedestrian way, [pedestrians] would have to cross [US] 223 at a street intersection and a rail grade crossing and a drainage ditch."  J.A. at 174 (Wonacott Test. at 156:16-18).  Apparently, owing to the previous Railroad president's failure to transfer records, the Railroad's president, Mark Dobronski, did not become aware of the correspondence from the Village regarding the sidewalk project until he received a letter from the Village Attorney, Frank Riley, in August 2003.  The

letter stated that, if the Railroad failed to complete the sidewalk, the Village would complete the construction and bill the Railroad. Dobronski testified that he responded with a letter stating that he thought the Federal Railway Safety Act ("FRSA") preempted the Village's actions.

Dobronski met with town officials in mid-September. After talking with the engineer for the project, Dobronski became concerned "because he didn't seem to know much of anything about what the railroad standards or the specifications were." J.A. at 123 (Dobronski Test. at 34:8-10). Despite these discussions, the Village installed the sidewalk without the Railroad's consent "between November and December 2003." J.A. at 79 (Mem. Op. at 4). "The sidewalk constructed along US 223 is within the right-of-way of the Michigan Department of Transportation ("MDOT") and abuts real property owned by [the Railroad] on which" the train depot is situated. J.A. at 79 (Mem. Op. at 4). Additionally, "[a] portion of the constructed sidewalks near where [the Railroad's] tracks cross US 223 several hundred feet east of the depot is outside the MDOT right-of-way and is on [the Railroad's] property." *Id.*

The Village's 2004 sidewalk project involved installing a new walkway across the Railroad's tracks and repairing two existing walkways. On August 13, 2004, the Village sent a letter to the Railroad stating that, because the Railroad had not responded, the Village would once again contract out the sidewalk work and bill the Railroad unless the Railroad completed the work by September 17, 2004. As in 2003, when the Railroad did not proceed with construction, the Village did. On September 20, 2004, Dobronski was alerted that one of the Railroad's engineers had to conduct an emergency stop because a gravel truck used in the construction was parked across the tracks. Dobronski immediately visited the area and observed construction taking place. Dobronski testified that he was "in utter disbelief seeing a bulldozer going down bumping into my rail, chopping up ties, doing damage to the railroad infrastructure." J.A. at 137 (Dobronski Test. at 55:7-9). After this incident, Dobronski sent a "cease and desist" letter to the Village. J.A. at 80 (Mem. Op. at 5). In December 2004, the Village completed work on the walkways across the tracks.

The district court found that the sidewalks constructed by the Village "have not benefitted [the Railroad] in any material respect." J.A. at 82 (Mem. Op. at 7). In fact, the district court found that the sidewalk construction was "detrimental" to the Railroad because it "potentially increas[ed] its premises liability, and thereby has affected negatively the value of [the Railroad's] operations." J.A. at 83 (Mem. Op. at 8). There currently is a lien against the Railroad's property as a result of its failure to pay the assessments for the construction. At the time of the trial in November 2006, the district court found that the lien amount exceeded $22,000. The district court found that the sidewalk construction constituted a "financial burden on [the Railroad] and divert[ed] money which could be spent on other matters," particularly given that the Railroad had lost money since 2002. J.A. at 83 (Mem. Op. at 8). Finally, the district court found that the Railroad did not pay property taxes to the Village for property that it owns within Village limits.

On January 10, 2006, the Railroad filed a complaint in the United States District Court for the Eastern District of Michigan seeking declaratory relief. The Railroad requested a declaratory judgment that the Village

> may not impose its rules and regulations against [the Railroad] for safety matters occurring on or about [the Railroad's] property and right of way, in particular, requiring [the Railroad] to construct roadways, grade level crossings; and assessing against [the Railroad] and its property a fee for construction of walkways along and upon the [the Railroad's] property and right of way.

J.A. at 9 (Complaint). The Railroad also sought a declaratory judgment "that the lien filed by [the Village] against [the Railroad's] property for construction of walkways [was] invalid." J.A. at 9 (Complaint). The Railroad claimed money damages incurred during the Village's construction, but this claim was dismissed without prejudice on April 27, 2006, pursuant to the parties' stipulation.

The district court denied the Railroad's motion for summary judgment on October 25, 2006. At that time, the district court noted that "although the preemptive effect of the ICCTA appears to have evolved into Plaintiff's primary argument, both parties . . . focused their briefing [for the motion for summary judgment] more on the

FRSA than on the ICCTA," and the district court requested additional briefing on the ICCTA prior to trial. J.A. at 40 (Op. & Order Den. Pl.'s Mot. for Summ. J. at 16 n.14). The district court held a bench trial on November 27, 2006, and, on April 30, 2007, the district court issued a written opinion entering judgment in favor of the Railroad. The Village filed a timely appeal. The Railroad cross-appealed, but later voluntarily withdrew its cross-appeal.

## II. ANALYSIS

We must decide whether the district court erred in finding that the Termination Act, also known as the ICCTA, preempts Mich. Comp. Laws § 462.309, which requires the Railroad to pay for the installation and upkeep of sidewalks that abut and cross Railroad property.[1]

## A. Jurisdiction and Standard of Review

The district court's subject-matter jurisdiction in this case is based on the federal-question statute, 28 U.S.C. § 1331. We have appellate jurisdiction over the final decision in the case pursuant to 28 U.S.C. § 1291.

We review de novo district-court determinations of federal preemption. *Nye v. CSX Transp. Inc.*, 437 F.3d 556, 560 (6th Cir. 2006). "In considering a district court's decision following a bench trial, we review for clear error the district court's findings of fact." *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 550 (6th Cir. 2004) (internal quotation marks omitted). "[T]he findings are not clearly erroneous unless the reviewing court, on the entire evidence, is left with a definite and

---

[1]The district court held that the Federal Railroad Safety Act of 1970 ("FRSA"), Pub. L. 91-458, 84 Stat. 971, does not preempt the Michigan statute at issue. Although the Railroad filed a cross-appeal challenging this holding, we granted the Railroad's motion voluntarily to dismiss its cross appeal. We therefore do not address FRSA preemption.

We do note, however, that the FRSA and the Termination Act are not in conflict. "[T]he agencies' complementary exercise of their statutory authority accurately reflects Congress's intent for the [Termination Act] and FRSA to be construed *in pari materia*." *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001). "Congress vested the FRA with primary authority over national rail safety policy and assigned the [Surface Transportation Board] the duty to encourage 'safe and suitable working conditions' for railway employees through its assessment of individual railway proposals subject to its authority." *Id.* A statute or regulation that is not preempted by the FRSA may be preempted by the Termination Act, and vice versa. *Id.*

firm conviction that a mistake was committed; and the burden is upon appellant to show such a mistake." *J.A. Jones Constr. Co. v. Englert Eng'g Co.*, 438 F.2d 3, 5 (6th Cir. 1971) (internal quotation marks omitted).[2]

## B. Termination-Act Preemption

The district court held that the Termination Act preempted the Michigan statute requiring the Railroad to pay for both pedestrian crossings installed across the Railroad's tracks and sidewalks near and on the Railroad's property. The district court analyzed the preemption provisions of the Termination Act and determined that "the construction or repair of all of the sidewalks in this case constitutes construction of 'facilities' under 49 U.S.C. § 10501(2), and thus falls within the exclusive jurisdiction of the STB." J.A. at 96 (Mem. Op. at 21). It held that the "ICCTA preempts not only an attempt to require a railroad to construct facilities, but also an attempt to require a railroad to pay for that construction." *Id.* In addition, the district court held that the statute imposed "an unbudgeted and undue burden on [the Railroad], thus diverting funds from other railroad expenses or operations, particularly from [the Railroad's] maintenance fund." J.A. at 97 (Mem. Op. at 22) (footnote omitted).

The Village argues that it acted under its police power to provide walkways across the railroad tracks for pedestrian safety pursuant to Michigan statutes, Mich. Comp. Laws §§ 462.131 and 462.309, that do not "attempt to regulate rail transportation" on their face. Appellant Br. at 14-15. The Village further argues that it would be too broad a reading of the Termination Act's preemption provision to hold that any tangential economic effect is preempted even if not an attempt to regulate the railroad. The Railroad, on the other hand, argues that we have adopted a "broad reading of Congress' preemption intent" in the Termination Act and that preemption especially applies when there is an economic impact on the railroad. Appellee Br. at 29 (quoting *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 229 F.3d 523, 562 (6th Cir. 2002) (quoting

---

[2]Because the Village does not argue on appeal that the district court's factual findings were clearly erroneous, we adopt the district court's factual findings for purposes of our analysis. *J.A. Jones Constr. Co.*, 438 F.2d at 5.

*City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998))). Regardless of the Village's intent, the Railroad argues that the impact of the Village's actions was to regulate rail transportation because of the economic burden imposed upon the Railroad.

The Michigan Department of Transportation has "regulatory and police power over railroad companies in [Michigan] insofar as such power has not been preempted by federal law or regulation." Mich. Comp. Laws § 462.131(1). Under this regulatory scheme, Michigan law requires that

> [a] railroad owning tracks across a public street or highway at grade shall at its sole cost and expense construct and thereafter maintain, renew, and repair all railroad roadbed, track, and railroad culverts within the confines of the street or highway, and the streets or sidewalks lying between the rails and for a distance outside the rails of 1 foot beyond the end of the ties.

Mich. Comp. Laws § 462.309(1). Michigan instructs local units of government that "[i]n cases of sidewalk repair or construction, a railroad shall first be given the right to construct in the same manner as that right is given to individuals." Mich. Comp. Laws § 462.309(6). If the railroad fails to repair or construct a sidewalk, "the local unit of government may cause the sidewalk to be constructed at the expense of the railroad, with the cost to be collected in the usual manner as provided in the law governing that local unit of government." *Id.*

The Termination Act established the Surface Transportation Board ("STB"), 49 U.S.C. § 701, and gave the STB exclusive jurisdiction over certain aspects of railroad transportation, 49 U.S.C. § 10501(b).[3] The Termination Act further states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under

---

[3]Specifically, the STB has exclusive jurisdiction over "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." § 10501(b).

Federal or State law." § 10501(b).**4** The Termination Act therefore "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)). "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." *PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 544-45 (5th Cir. 2005) (quoting H.R. Rep. No. 104-311, at 95-96 (1995)).

"The STB has articulated a comprehensive test for determining the extent to which a particular state action or remedy is preempted by § 10501(b)." *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008).**5** The STB's approach is persuasive because the STB was authorized by Congress to administer the Termination Act and is therefore "uniquely qualified to determine whether state law should be preempted by the [Termination Act]." *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir. 2007) (quoting *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005)). As the Fifth Circuit recently explained, "[t]he STB's preemption analysis distinguishes between two types of preempted state actions or regulations," those that are "categorically preempted" and those that are only preempted "as applied." *Barrois*, 533 F.3d at 332.

---

**4**The Village argues that if the Railroad believed that this case fell within the jurisdiction of the STB and ICCTA preemption applied, then the Railroad should have submitted the issue to the STB rather than filing a claim in federal court. Because the Village did not raise this argument in the district court, we will not consider this issue. *See B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 268 (6th Cir. 2008) (noting that we will consider issues not raised below only in exceptional cases). We observe, however, that the Village appears to be conflating the issue of the exclusive jurisdiction of the STB with the issue of preemption of state law by the Termination Act. Moreover, courts have held that a party need not submit a preemption question directly to the STB prior to filing suit in federal court. *See, e.g.*, *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252-53 (3d Cir. 2007).

**5**Although the Fifth Circuit in *Barrois* was deciding a question of complete preemption for purposes of federal subject-matter jurisdiction rather than ordinary, defensive preemption, the court explicitly applied the STB's ordinary-preemption analysis. 533 F.3d at 332. We therefore find the court's reasoning persuasive in deciding the question of ordinary preemption raised here by the Railroad.

First, state actions are "categorically" or "facially" preempted where they "would directly conflict with exclusive federal regulation of railroads." *Id*. (quoting *CSX Transp., Inc.*, STB Fin. Docket No. 34662, 2005 WL 1024490, at *3 (S.T.B. May 3, 2005)). Courts and the STB have recognized "two broad categories of state and local actions" that are categorically preempted regardless of the context of the action: (1) "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized" and (2) "state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service." *CSX Transp.*, 2005 WL 1024490, at *2 (citations and footnote omitted); *see also Barrois*, 533 F.3d at 332; *Emerson*, 503 F.3d at 1130; *Green Mountain*, 404 F.3d at 642. Because these categories of state regulation are "*per se* unreasonable interference with interstate commerce," "the preemption analysis is addressed not to the reasonableness of the particular state or local action, but rather to the act of regulation itself." *CSX Transp.*, 2005 WL 1024490, at *3; *see also Barrois*, 533 F.3d at 332; *Green Mountain*, 404 F.3d at 644. Second, those state actions that do not fall into one of these categories may be preempted *as applied*: "For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *Barrois*, 533 F.3d at 332 (quoting *CSX Transp.*, 2005 WL 1024490, at *3).

As the Fifth Circuit recently noted, "the STB has clearly identified where routine crossing disputes, such as the one at issue in this case, fall in this scheme of ICCTA preemption." *Id*. "Routine crossing disputes," "despite the fact that they touch the tracks in some literal sense," "are *not* typically preempted." *Id*. at 332-33 (noting "that '[t]hese crossing disputes are typically resolved in state courts'" (quoting *Maumee & W. R.R. Corp. & RMW Ventures, LLC*, STB Fin. Docket No. 34354, 2004 WL 395835, at *2 (S.T.B. Mar. 3, 2004))). We agree that "[t]he STB's position with respect to these

routine crossing cases is consistent with the historical, pre-ICCTA rule governing these crossing disputes." *Id*. at 333. As the Supreme Court explained,

> The care of grade crossings is peculiarly within the police power of the states, and, if it is seriously contended that the cost of this grade crossing is such as to interfere with or impair economical management of the railroad, this should be made clear. It was certainly not intended by the Transportation Act to take from the states or to thrust upon the Interstate Commerce Commission investigation into parochial matters like this, unless by reason of their effect on economical management and service, their general bearing is clear.

*Id*. (quoting *Lehigh Valley R.R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 35 (1928)).[6]

We therefore apply the as-applied-preemption analysis to the Michigan statutes at issue. "[T]he touchstone [of this analysis] is whether the state regulation imposes an unreasonable burden on railroading." *Jackson*, 500 F.3d at 253. As summarized by the Third Circuit, the STB has found that a state regulation is permissible as long as "(1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads." *Id*.; *see also Green Mountain*, 404 F.3d at 643. Regarding the unreasonable-burden prong, "the substance of the regulation must not be so draconian that it prevents the railroad from carrying out its business in a sensible fashion," and "the regulation must be settled and definite enough to avoid open-ended delays." *Jackson*, 500 F.3d at 254. To pass the non-discrimination prong, a state regulation "must address state concerns generally, without targeting the railroad industry." *Id*. States retain their police powers, allowing them to create health and safety measures, but "those rules must be clear enough that the rail carrier can follow them and . . . the state cannot easily use them as a pretext for interfering with or curtailing rail service." *Id*.

---

[6] The district court determined that the Termination Act preempts Mich. Comp. Laws § 462.309(6) because the sidewalks at issue constitute "facilities" over which the STB has exclusive jurisdiction. J.A. at 96 (Mem. Op. at 21) (quoting 49 U.S.C. § 10501(b)(2)). Neither the district court nor the Railroad, however, has pointed to a definition of "facilities." We found no prior federal court decisions or STB decisions holding, either explicitly or implicitly, that sidewalks should be considered "facilities" under the statute. Indeed, *Barrois*, which held that a state statute giving private landowners the ability to install at-grade railroad crossings to reach their property was not preempted by the Termination Act, noted that regulation of such crossings has historically been "peculiarly within the police power of the states." 533 F.3d at 333 (quoting *Lehigh Valley*, 278 U.S. at 35).

Under this analysis, state actions are not preempted merely because they reduce the profits of a railroad: "We doubt whether increased operating costs are alone sufficient to establish 'unreasonable' interference with railroad operations." *Barrois*, 533 F.3d at 335; *see also Fla. E. Coast Ry.*, 266 F.3d at 1338 n.11 ("No statement of purpose for the ICCTA, whether in the statute itself or in the major legislative history, suggests that any action which prevents an individual firm from maximizing its profits is to be pre-empted."). Although the "costs of compliance" with a state law could be high, "they are 'incidental' when they are subordinate outlays that all firms build into the cost of doing business." *Jackson*, 500 F.3d at 254.

We conclude that Mich. Comp. Laws § 462.309 is not preempted by the Termination Act, because it is not unreasonably burdensome and does not discriminate against railroads. We recognize that the district court found that the Railroad has been losing money and that the costs of sidewalk construction would create a financial burden for the Railroad. The fact that the statute may prevent the Railroad from maximizing its profits, however, does not render the statute *unreasonably* burdensome. *See Fla. E. Coast Ry. Co.*, 266 F.3d at 1338 n.11 ("Naturally, at some level, all regulation places constraints on firms' profit-maximizing behavior."). A statutory requirement that the Railroad pay for pedestrian sidewalks and walkways is merely part of the cost of doing business as a railway running through the center of a town. *See Jackson*, 500 F.3d at 254.

The fact that Mich. Comp. Laws § 462.309 applies specifically to railroads does not make it discriminatory. This is not an instance in which the state has chosen to require something of the Railroad that it does not require of similarly situated entities. The concerns that animated the Village's sidewalk construction apply only to the Railroad because the railroad bisects the town and pedestrian walkways are needed for public safety. Further, unlike environmental permitting, there is no evidence that local bodies could target railroads with the statute at issue in order to cause indefinite delays for railroad operations. *See Green Mountain*, 404 F.3d at 643. Indeed, the Michigan statute gives the Railroad an opportunity to construct the sidewalks itself. Thus, because

§ 462.309(6) addresses a general state concern about the safety of pedestrians, it does not discriminate against the Railroad.

As in *Barrois*, "[t]he Railroad does not allege that private crossings generally are fundamentally inconsistent with the Railroad's ability to operate." 533 F.3d at 334-35. Instead, the Railroad argues that the manner in which Mich. Comp. Laws § 462.309 was implemented by the Village has interfered with the Railroad's operations. Our role, however, is not to determine whether the Village properly followed the Michigan law under which it acted; our role is to determine whether requiring the Railroad to pay for the construction and maintenance of sidewalks could be "easily" used as a "pretext" that would allow the state of Michigan or its localities to interfere with railroad activities in an unreasonable or discriminatory manner. *Jackson*, 500 F.3d at 254; *see also Barrois*, 533 F.3d at 334 (noting that the court's role was to determine whether the state statute interfered with railroad operations rather than to determine if the private landowners had properly constructed the railroad crossings at issue). Given that § 462.309(6) dictates that "a railroad shall first be given the right to construct in the same manner as that right is given to individuals" before the locality may begin construction, the interference with railroad operations is negligible. Our reading of the record indicates that the particular difficulties the Railroad encountered owing to the construction did not result from the construction of walkways and sidewalks per se, but from the construction methods employed by the Village. We think that "the [Michigan] statutory scheme . . . is sufficiently broad and flexible to permit the [Michigan] courts to take account of [the competing interests] without *unreasonably* interfering with railroad operations." *Barrois*, 533 F.3d at 336.[7]

---

[7]We make no judgment on the substantive merits of any state-law claims either party may have against the other stemming from the construction or assessment.

## III.  CONCLUSION

Because we conclude that the Termination Act does not preempt Mich. Comp. Laws § 462.309, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings not inconsistent with this opinion.