RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CSX TRANSPORTATION, INC.,

                       *Plaintiff-Appellee*,

    *v.*

                                             > No. 18-5647

CITY OF SEBREE, KENTUCKY,

                       *Defendant-Appellant*.

─────────────

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:17-cv-00137—Joseph H. McKinley, Jr., District Judge.

Argued: January 30, 2019

Decided and Filed: May 14, 2019

Before: COLE, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Jennifer Parker Andrews, KING, DEEP & BRANAMAN, Henderson, Kentucky, for Appellant. Andrew E. Tauber, MAYER BROWN LLP, Washington, D.C., for Appellee. **ON BRIEF:** Jennifer Parker Andrews, H. Randall Redding, KING, DEEP & BRANAMAN, Henderson, Kentucky, for Appellant. Andrew E. Tauber, MAYER BROWN LLP, Washington, D.C., Christopher J. Ferro, MAYER BROWN LLP, Chicago, Illinois, Rod Payne, BOEHL STOPHER & GRAVES LLP, Louisville, Kentucky, for Appellee.

─────────────

## OPINION

─────────────

COLE, Chief Judge. In 1966, the City of Sebree, Kentucky (the "City") enacted an ordinance requiring CSX Transportation, Inc.'s ("CSX") predecessor to obtain approval from

city council before commencing any maintenance or construction project that would result in any change in grade at any of the six railroad crossings in Sebree. After a dispute surrounding the ordinance in 1979, the predecessor railroad company and the City entered into a settlement agreement whereby the rail company agreed not to raise the height of one crossing by more than 0.4 feet and not to raise the height of another crossing at all. In 2017, CSX notified the City of its intent to perform maintenance that would result in raising four of the crossings, which led to the current lawsuit. CSX sought, and the district court granted, a permanent injunction prohibiting the City from enforcing the ordinance or settlement agreement. Because we agree with the district court that both the ordinance and settlement agreement are preempted by federal railroad statutes, we affirm.

## I. BACKGROUND

An active railroad line runs through Sebree, a 1.6 square mile city in Webster County, Kentucky. The rail line, operated by CSX, crosses six streets in Sebree: Jefferson, Webster, Main, Dixon, Mill, and Sebree Springs. Each of the crossings is a "peaked" or "humped" crossing, meaning that there is a change in grade from the street to the top of the rails with the railway tracks sitting higher than the road. The height of the crossings has long been a source of concern for the City. According to the City, the elevation of the crossings creates two primary safety concerns: (1) line of sight obstructions for vehicles and pedestrians crossing the tracks, and (2) a risk that low-profile vehicles and vehicles with long wheel bases, such as trucks and buses, will become stuck or disabled. Understandably, the City does not want the height of the crossings to be raised any further.

On May 11, 1966, the City enacted an Ordinance (the "Ordinance") requiring Louisville and Nashville Railroad ("L&N")—CSX's predecessor in interest—to obtain prior approval from the city council before commencing maintenance or construction that would result in any change in grade at any of the crossings in Sebree. The Ordinance imposes a fine of not less than $50.00 per day until the change is corrected.

Despite the Ordinance, L&N raised the crossings at Jefferson and Webster in 1978 without seeking prior approval from the City. The City informed L&N of its intent to enforce

the Ordinance if L&N attempted to raise the crossings at Main and Dixon.  L&N thereafter filed a lawsuit in the Webster County Circuit Court seeking to invalidate the Ordinance and requesting an injunction preventing the City from enforcing it.  The circuit court issued an order in July of 1979, denying L&N's request for an injunction and temporarily enjoining L&N from making any repairs that would raise the elevation of the Main Street or Dixon Street crossings without the approval of Sebree's city council.  In November 1979, L&N and the City resolved the litigation by entering an agreed order of dismissal (the "Agreed Order") that removed the temporary injunction against L&N.  Pursuant to the Agreed Order, L&N agreed not to raise the level of the tracks at Main Street more than 0.4 feet above its then-current level, and not to raise the level of the tracks at Dixon Street at all.

Years later, CSX, as L&N's successor in interest, determined that it needed to conduct maintenance on the tracks in Sebree to correct the problem of fouled ballast.  Ballast refers to the crushed rock used to support tracks and allow proper drainage.  The ballast becomes fouled when smaller particles clog the space between the crushed rock, reducing the ability of water to drain freely.  There are at least two maintenance methods that can be utilized to correct fouled ballast.  One method, surfacing, entails lifting the track, which breaks the bottom of the ties—the supports to which railroad rails are fastened—free from the compacted fouled ballast, and then raising the track to the desired height and forcing ballast back underneath.  Another method is undercutting, which is the removal of all ballast between the ties from approximately eight inches under the bottom of the ties.  Surfacing results in raising the height of the crossings, but undercutting can be done while maintaining the height of the grade, or even lowering it.

In 2013, CSX began undertaking maintenance work that would result in an increase in the height of four of the railroad crossings in Sebree.  Sebree police "arrived on the scene and threat[ened] CSX[] personnel with arrest[,]" and CSX was thus "not able to conduct the proposed maintenance that would result in raising the tracks." (Compl., R. 1, PageID 6.)  In August 2017, CSX informed the City of its intent to perform track maintenance that would result in raising the crossings at Dixon, Main, Webster, and Jefferson Streets by two to three inches.  CSX also informed the City of its intent to perform additional work at the Jefferson Street crossing, which would not raise the grade of the crossing.  In October 2017, the Sebree city

council met to discuss CSX's proposed track maintenance and voted 6-0 to deny CSX's request to perform any of the proposed maintenance work.

After the request to perform maintenance was denied, CSX brought this action for injunctive relief in the United States District Court for the Western District of Kentucky. CSX sought a preliminary injunction, seeking to prohibit the City from enforcing the Ordinance or the Agreed Order, or otherwise interfering with CSX's railroad operations. The district court combined the hearing on the preliminary injunction with a trial on the merits, and the proceeding was held on March 1, 2018.

On May 24, 2018, the district court issued an opinion, holding that the Ordinance was preempted by the Interstate Commerce Commission Termination Act ("Termination Act"), and the Agreed Order was void as a matter of public policy. The court entered judgment in favor of CSX and permanently enjoined the City from "any enforcement of either the 1966 Ordinance or 1979 Agreed Order or otherwise undertaking any action which would seek to prevent CSX from raising its tracks for maintenance purposes within the City of Sebree." (J., R. 26, PageID 641.)

The City timely appealed.

## II. ANALYSIS

### A. Standard of Review

In reviewing a decision to grant or deny a motion for a permanent injunction, "we employ several different standards of review. 'Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for an abuse of discretion.'" *Sec'y of Labor, U.S. Dep't of Labor v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003) (quoting *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local Union 2359*, 186 F.3d 733, 737 (6th Cir. 1999)). A district court's determination of federal preemption is reviewed de novo. *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 537 (6th Cir. 2008).

## B. Ordinance

We must first determine whether the Ordinance is preempted by federal laws governing railroad transportation. "Under the Supremacy Clause of the Constitution, federal law preempts conflicting state law." *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522 (6th Cir. 2001). Generally, "there is a presumption against the supplanting of historic state police powers" unless preemption is the "clear and manifest purpose of Congress." *Id.* (citation and internal quotation marks omitted). Congress's intent can be found in explicit statutory language or a statute's structure and purpose. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). When a statute contains an explicit preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). The "ultimate touchstone" of a preemption analysis, however, is "Congress's purpose." *Tyrrell*, 248 F.3d at 522 (citation and internal quotation marks omitted).

Two federal statutes that govern the railroad industry possibly preempt the Ordinance: (1) the Termination Act; and (2) the Federal Railroad Safety Act ("FRSA"). We begin, as the district court did, with an analysis of whether the Ordinance is preempted under the Termination Act. Congress enacted the Termination Act in 1995, establishing the Surface Transportation Board ("STB") and giving the STB exclusive jurisdiction over certain aspects of railroad transportation. 49 U.S.C. §§ 1301, 10501(b). Specifically, the Termination Act provides that:

> The jurisdiction of the [STB] over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive.

49 U.S.C. § 10501(b).  "Transportation" is broadly defined to include all equipment and services related to the movement of property by rail.  49 U.S.C. § 10102(9).  The Termination Act further includes an express preemption provision, stating:

> Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

"'It is difficult to imagine a broader statement of Congress'[s] intent to preempt state regulatory authority over railroad operations.'"  *CSX Transp., Inc.*, Fin. Docket No. 34662, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005) (quoting *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996)).  "The Termination Act therefore 'preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'"  *Blissfield*, 550 F.3d at 539 (quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007)).  While states retain their general police powers, "'the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.'"  *Id.* (quoting *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535 (5th Cir. 2005)).

We have adopted the STB's "'comprehensive test for determining the extent to which a particular state action or remedy is preempted by § 10501(b).'"  *Id.* (quoting *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008)).  Under that test, there are two types of preempted state actions or regulations:  those that are "categorically preempted" and those that are "preempted as applied."  *Id.* at 540.  A state regulation is categorically or facially preempted if it "would directly conflict with exclusive federal regulation of railroads."  *Id.* (quoting *Barrois*, 533 F.3d at 332).  Even if a state or local action is not categorically preempted, it may be preempted as applied.  The as-applied analysis requires an "'assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.'"  *Id.* (quoting *Barrois*, 533 F.3d at 332).

CSX argues that the Ordinance is categorically preempted, while the City urges us to conduct only the as-applied preemption analysis. Even under the as-applied analysis, we hold that the Ordinance is preempted by the Termination Act.

A regulation is permissible as applied so long as "(1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads." *Id.* at 541 (quoting *Jackson*, 500 F.3d at 253). The "touchstone" of the as-applied analysis "is whether the state regulation imposes an unreasonable burden on railroading." *Id.* (quoting *Jackson*, 500 F.3d at 253). In terms of the unreasonably-burdensome prong, "'the substance of the regulation must not be so draconian that it prevents the railroad from carrying out its business in a sensible fashion' and 'the regulation must be settled and definite enough to avoid open-ended delays.'" *Id.* (quoting *Jackson*, 500 F.3d at 254). "States retain their police powers, allowing them to create health and safety measures, but 'those rules must be clear enough that the rail carrier can follow them and . . . the state cannot easily use them as a pretext for interfering with or curtailing rail service.'" *Id.* (alteration in original) (quoting *Jackson*, 500 F.3d at 254).

Here, the Ordinance is not settled and definite enough to avoid open-ended delays, and it could easily be used as a pretext for interfering with rail service. The Ordinance states that, "before any change in grade is made by the . . . Railroad at any of the street crossings in the City[,] there first shall be filed with the City Clerk an application to the City Council setting out such change in grade and approval of the City Council . . . must be secured before commencing construction." (Ordinance, R. 1-1, PageID 12.) The Ordinance does not contain any standards cabining the city council's discretion, nor any restrictions on how long the city council could take to decide whether to allow CSX to conduct necessary maintenance or construction. The Ordinance could thus be used to deny CSX the ability to conduct its preferred method of maintenance both pretextually and indefinitely. Indeed, the Ordinance was used to deny CSX the ability to conduct maintenance—even the maintenance at Jefferson Street that would not have raised the grade of the crossing.

Such an open-ended regulation is prohibited by the Termination Act. *See Jackson*, 500 F.3d at 254 ("[R]egulations may not (1) be so open-ended as to all but ensure delay and disagreement, or (2) actually be used unreasonably to delay or interfere with rail carriage.");

*Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (holding permit requirement was "preempted for two reasons: (i) it unduly interfere[d] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations; and (ii) it [could] be time-consuming, allowing a local body to delay construction of railroad facilities almost indefinitely") (citations omitted).[1]    The Ordinance thus cannot withstand the as-applied preemption analysis.

The Ordinance is preempted as applied for a second reason as well: forcing CSX to use certain maintenance methods imposes an unreasonable burden on CSX. Neither party disputes that maintenance is necessary to correct fouled ballast. Instead, the battle is over which method should be used. The City contends that, because CSX can still perform track maintenance using methods that do not raise the crossings, such as undercutting, the Ordinance is not unreasonably burdensome, and therefore not preempted as applied. In support, the City points to testimony from its expert, who stated that undercutting is a better long-term solution because it actually corrects the problem of fouled ballast by removing it, rather than applying a "band-aid" approach of raising the tracks, which needs to be done every five to seven years. And the City correctly notes that increased costs to the railroad are not enough to constitute an unreasonable burden. *See Blissfield*, 550 F.3d at 541 ("We doubt whether increased operating costs are alone sufficient to establish 'unreasonable' interference with railroad operations.") (quoting *Barrois*, 533 F.3d at 335).

But undercutting causes more of a burden than merely increasing costs. According to testimony provided by CSX's expert, undercutting presents a safety hazard because it threatens the structural integrity of the track. (*See* Hr'g Tr., R. 19, PageID 400 ("From a railroad perspective, undercutting is the last option that we want to do . . . because it, in fact, greatly weakens the track structure."); *id.* at PageID 431 ("[T]he primary issue with undercutting, it reduces train safety."); *id.* at PageID 432 (undercutting on tracks with welded rails "greatly raises the risk of buckled track derailments"); *id.* (undercutting "reduce[s] train safety for a long period

---

[1]We note that the parties discuss *Green Mountain* and related arguments in the context of whether the Ordinance is preempted under the categorical approach, but in *Blissfield*, we considered the concerns articulated in *Green Mountain* in our analysis of whether a regulation was preempted as applied. Thus, we do so here as well. *Blissfield*, 550 F.3d at 541.

of time").) Because the Ordinance has the effect of prohibiting CSX from using the maintenance method it prefers and believes is the "industry best practice," and instead requires the use of a method that "reduces train safety," it has the effect of unreasonably interfering with rail operations. (*See id.* at PageID 431, 433.)

Finally, the Ordinance "amount[s] to impermissible [local] regulation of [CSX's] operations by interfering with the railroad's ability to uniformly design, construct, maintain, and repair its railroad line." *Thomas Tubbs*, No. 35792, 2014 WL 5508153, *5 (S.T.B. Oct. 29, 2014). For example, forcing CSX to utilize undercutting in Sebree would result in the line maintaining its current height there, but if CSX surfaces the portions of its track outside of Sebree—and therefore raises them—it could result in an uneven track in violation of federal regulations. *See* 49 C.F.R. § 213.63 (regulating track surface); 49 C.F.R. § 213.55 (providing track alinement may not deviate from uniformity more than prescribed amounts). In any event, the Ordinance interferes with the railroad's ability to maintain uniformity, in direct contravention of the purpose of the Termination Act's preemption provision to "prevent a patchwork of state and local regulation from unreasonably interfering with interstate commerce." *Tubbs*, 2014 WL 5508153 at *5. It is therefore preempted under the Termination Act.

Still, the City argues that the Ordinance is expressly permitted by the FRSA's savings clause and cannot therefore be preempted by the Termination Act. But the FRSA does not save the Ordinance from preemption for one simple reason: we have held that the FRSA's savings clause only applies to *state* regulations and cannot save any *municipal* regulations. *See CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626, 628 (6th Cir. 1996) (holding that Plymouth's ordinance did not fall within the FRSA's preemption clause exceptions because the "exceptions apply only to a '*State* . . . law, regulation, or order'") (quoting 49 U.S.C. § 20106).

We note that *Tyrrell* suggests that if a regulation has a connection with rail safety then the "FRSA provides the applicable standard for assessing federal preemption." 248 F.3d at 524. The district court made no finding as to whether the Ordinance is related to rail safety, but even if it is, our conclusion that the Ordinance is preempted does not change when we analyze preemption under the FRSA. A regulation is preempted under the FRSA if "a FRSA regulation 'substantially subsume[s]' the subject matter of the suit." *Nickels v. Grand Trunk W. R.R., Inc.*,

560 F.3d 426, 429 (6th Cir. 2009) (alteration in original) (quoting *Easterwood*, 507 U.S. at 664). Regulations relating to track structure and geometry substantially subsume the subject matter of this suit. First, 49 C.F.R. §§ 213.63 and 213.55 regulate track surface and track alinement, and CSX's ability to comply with these regulations could be jeopardized if the track in Sebree cannot be raised.

Additionally, 49 C.F.R. § 213.103 details ballast requirements and requires the track to be supported by material which will "[p]rovide adequate drainage for the track . . . and [m]aintain proper track crosslevel, surface, and alinement." Although 49 C.F.R. § 213.103 does not directly mandate a maintenance method to correct fouled ballast, "the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issue of ballast" maintenance. *See Nickels*, 560 F.3d at 431 (holding that even though 49 C.F.R. § 213.103 does not directly regulate ballast size, a lawsuit relating to ballast size was preempted under the FRSA); *see also CSX Transp., Inc. v. City of Plymouth*, 283 F.3d 812, 817 (6th Cir. 2002) (holding anti-blocking statute preempted by FRSA because it would "require CSX[] to modify either the speed at which its trains travel or their length"). The Ordinance is thus also preempted under the FRSA.

## C. Agreed Order

Having concluded that the Ordinance is preempted, we must next decide whether the Agreed Order is preempted. Like the Ordinance, the Agreed Order unreasonably interferes with rail transportation because it directs CSX to use a certain maintenance method (despite the safety hazards associated with that method), and it covers a subject substantially subsumed by federal regulations. The City argues that CSX cannot use the Termination Act to avoid its obligations under the Agreed Order. We generally agree that contracts that were "freely negotiated between sophisticated business parties" should not be easily set aside, as they "reflect a market calculation" that the benefits of the agreement outweigh the costs. *See PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 221 (4th Cir. 2009).

But the circumstances presented in this case convince us that the Agreed Order constitutes an unreasonable interference with rail transportation and is thus void. The Agreed

Order was entered into in 1979, over fifteen years before the Termination Act was enacted. And CSX presented evidence that circumstances have materially changed since the agreement was voluntarily entered into by its predecessor: train loads are heavier and trains are faster now than they were back then, and the rails in Sebree are now "welded rails" as opposed to "jointed rails." (Hr'g Tr., R. 19, PageID 432.) CSX's expert testified that these changes "greatly raise[] the risk of buckled track derailments" by "decrease[ing the] track structure that holds the track in line." (*Id.*) Thus, CSX's ability to perform undercutting, as opposed to surfacing, is "greatly different" today than when the Agreed Order was signed. (*Id.*) We thus conclude that the Agreed Order is preempted under the Termination Act and therefore void as against public policy. *See R.R. Ventures*, Fin. Docket No. 33385, 2000 WL 1125904, at *2 (S.T.B. 2000) ("While the Board encourages privately negotiated agreements, any contractual restrictions that unreasonably interfere with common carrier operations are deemed void as contrary to public policy.").

The City points to two cases in an attempt to persuade us otherwise: (1) *Township of Woodbridge, et al. v. Consolidated Rail Corp.*, 2000 WL 1771044 (S.T.B. 2000), and (2) *PCS Phosphate*, 559 F.3d at 221. In *Woodbridge*, the STB held that the rail company was bound by a voluntary agreement requiring it to curtail the idling of locomotives and the switching of rail cars between certain hours. 2000 WL 1771044, at *1, *3. And in *PCS Phosphate*, the Fourth Circuit held that an agreement between a rail company and a mine requiring the rail company to pay to relocate its track if it interfered with mining operations was not preempted by the Termination Act. 559 F.3d at 215, 221. Both cases, however, were careful not to hold that a voluntarily agreement can *never* be preempted by the Termination Act. *See id.* at 221 ("This is not to say that a voluntary agreement could never constitute an 'unreasonable interference' with rail transportation, but the facts of this case indicate that any interference is not unreasonable"); *Woodbridge*, 2000 WL 1771044, at *3 (noting the rail company "ha[d] not shown that enforcement of its commitments would unreasonably interfere with the railroad's operations"). Unlike the rail companies in those cases, CSX has shown that the Agreed Order would unreasonably interfere with its rail operations by forcing it to utilize a maintenance method that is no longer safe. We thus conclude that it is void as against public policy.

**D. Scope of the Injunction**

The only remaining question is whether the scope of the injunction is impermissibly broad. Even assuming the City did not waive this objection, as CSX argues, we conclude that the district court did not abuse its discretion in setting the scope of the injunction. The district court entered judgment in favor of CSX and permanently enjoined the City from "any enforcement of either the 1966 Ordinance or 1979 Agreed Order *or otherwise undertaking any action which would seek to prevent CSX[] from raising its tracks for maintenance purposes within the City of Sebree.*" (J., R. 26, PageID 641) (emphasis added.) The City objects to the italicized portion of the judgment, arguing that the injunctive relief should be limited to the City's enforcement of the Ordinance and the Agreed Order. The City cites only one case, standing for the proposition that a "district court should limit the scope of the injunction to the conduct 'which has been found to have been pursued or is related to the proven unlawful conduct.'" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quoting *E.E.O.C. v. Wilson Metal Casket, Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).

But the scope of the injunction here is "sufficiently tailored to the . . . district court's findings . . . ." *Id.* at 755. The district court found that the Ordinance and the Agreed Order were preempted because they unreasonably interfered with CSX's ability to maintain its tracks. Any action that would seek to prevent CSX from raising its tracks for maintenance purposes would also unreasonably interfere with the railroad's ability to maintain its tracks. The district court did not abuse its discretion in prohibiting such conduct.

## III. CONCLUSION

We affirm the judgment of the district court.