PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PCS Phosphate Company,
Incorporated,

        *Plaintiff-Appellee,*

    v.

Norfolk Southern Corporation;
Norfolk Southern Railway
Company,

        *Defendants-Appellants.*

No. 08-1266

PCS Phosphate Company,
Incorporated,

        *Plaintiff-Appellant,*

    v.

Norfolk Southern Corporation;
Norfolk Southern Railway
Company,

        *Defendants-Appellees.*

No. 08-1285

Appeals from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Dever III, District Judge.
(4:05-cv-00055-D)

Argued: January 27, 2009

Decided: March 4, 2009

Before WILLIAMS, Chief Judge, WILKINSON, Circuit Judge, and Arthur L. ALARCÓN, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Williams and Judge Alarcón joined.

## COUNSEL

**ARGUED:** Craig Thomas Merritt, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Appellants/Cross-Appellees. Roy Bruce Thompson, II, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** R. Braxton Hill, IV, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Appellants/Cross-Appellees. Charles E. Raynal, IV, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Raleigh, North Carolina, for Appellee/Cross-Appellant.

## OPINION

WILKINSON, Circuit Judge:

This case involves a dispute between a rail carrier and a mine owner over payment for the relocation of the rail line that serves the mine. We affirm the district court's judgment that the rail carrier is liable for the payment pursuant to a covenant in the original deeds of easement granting the carrier's predecessor-in-interest a right-of-way across the mine's property. We hold that enforcement of the covenant is not preempted by the Interstate Commerce Commission Termination

Act, 49 U.S.C. § 10101 *et seq.*, because it is not the sort of rail "regulation" contemplated by the statute and, as a voluntary agreement, does not "unreasonably interfere" with rail transportation. At the same time, to honor the parties' original bargain, we reject plaintiff's attempt to change the terms of the agreement by seeking treble damages for breach of the agreement under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

I.

A.

The plaintiff in this case, PCS Phosphate Company, Inc. ("PCS") owns and operates the world's largest phosphate mine. The mine was projected to produce over 3 million tons of phosphate annually. PCS is the successor-in-interest to the prior owners of the mine: Texas Gulf Sulphur Company and North Carolina Phosphate Corporation. As its predecessors did, PCS relies on rail transportation to ship raw materials and products to and from the mine.

The defendants are Norfolk Southern Railway Company and its parent corporation Norfolk Southern Railway Corporation (collectively referred to as "Norfolk Southern"). Norfolk Southern currently operates the rail line that serves PCS and received over $65 million in payments from PCS for shipments over the line between 2001 and 2006. Norfolk Southern is the successor-in-interest to Norfolk Southern Railway Company ("Old NS")—the rail carrier that originally built and operated the line.

Old NS began constructing the 31.5 mile Lee Creek Rail Line to serve the mine in 1965 after receiving approval from the Interstate Commerce Commission. The last five miles of the line needed to cross land jointly owned by the mining corporations and others, so the land owners granted Old NS five deeds of easement to build the line across the land.

The first two deeds were executed on June 29, 1965 and used identical language. Another three deeds were subsequently executed using slightly different language. The deeds were all recorded in the Beaufort County Register of Deeds. They explicitly granted the easements to Old NS and "its successors and assigns" for as long as the easements "shall be used for railroad purposes and shall not be abandoned."

The deeds also contained multiple covenants. Of relevance here, each of the deeds contained a covenant whereby Old NS agreed to relocate the rail line when the mine owners deemed it necessary to mine operations. The first two deeds stated:

> If, after ten (10) years from the date of this instrument, either Grantor determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations in the Beaufort County, North Carolina area, then said Grantor shall notify Grantee in writing of its desire that the right of way and track be moved . . . and Grantors shall provide Grantee with a right of way and easement over said new location and *Grantee at its expense shall relocate the said track on the said new right of way* . . .

(emphasis added). The last three deeds contained a similar provision which stated, "[Old NS], at its expense, shall . . . relocate the said track on the said new right of way." With respect to the new location for the track, the deeds required that engineers from the mining company and Old NS would jointly determine the new location so that it would avoid "excessive curvature, grade and distances." The three later deeds also required that the new location "not necessitate excessive or unreasonable filling or bridge building" and that the "relocation will not affect the ability of [Old NS] to comply with its legal obligation to serve any existing customer then on its line."

Old NS completed the line and provided rail service as the sole carrier on the line until 1977. At that point another carrier began operating after it was granted access to the line as a condition of Norfolk Southern's acquisition of Old NS. In 1985, the mining corporations merged, and, in 1995, the new corporation was acquired and changed its name to PCS.

Years later, PCS conducted studies that confirmed it would need to mine under the rail line. It thus consulted engineers and drafted a proposal to relocate the line. After presenting the proposal to Norfolk Southern, PCS formally requested by letter on November 20, 2003, that Norfolk Southern pay to relocate the necessary portion of the line by mid-2007 so that the line would not interfere with mining operations.

Throughout discussions about the relocation, Norfolk Southern refused to pay to relocate the line. In a letter dated December 16, 2004, Norfolk Southern formally refused to relocate the line and explained that it was unsuccessful in securing third party funding for the relocation and therefore could not "economically justify bearing the costs of the relocation project." Furthermore, due to the decreased profitability of the line, Norfolk Southern stated that if PCS would not fund the relocation itself, it would seek permission from the Surface Transportation Board ("STB") to abandon the line. Norfolk Southern was aware that if it successfully abandoned the line, PCS would not be able to continue operating the mine because rail access was necessary to ship raw materials and products to and from the mine.

In an effort to mitigate its damages, PCS began constructing the relocated line at its own expense. Throughout the construction, PCS engineers sent details about the relocation to Norfolk Southern which initially stated in a letter that "the route proposed by PCS Phosphate is in general terms acceptable," and never subsequently objected to the proposal.

B.

On May 6, 2005, PCS filed this suit in the United States District Court for the Eastern District of North Carolina premised on diversity jurisdiction, 28 U.S.C. § 1332. PCS claimed that Norfolk Southern was liable for the cost of the relocation due to breach of contract, breach of easement covenants, and unjust enrichment. In addition, PCS claimed that Norfolk Southern was liable for treble damages and attorneys' fees under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, *id.* at § 75-16.1.

While the suit was pending, on November 17, 2005, Norfolk Southern filed an application with the STB to abandon the Lee Creek Line under 49 U.S.C. § 10903. On December 7, 2005, the STB rejected the application as "substantially incomplete and defective" because (1) it was premised on Norfolk Southern's liability for the relocation cost, but the liability needed to be resolved by a court, (2) it was not joined by the other rail carrier that serves the line, and (3) the necessary environmental report was deficient. *See Norfolk S. Ry. Co.—Abandonment—In Beaufort County, NC*, 2005 WL 3308783 (STB December 7, 2005). In its application, Norfolk Southern requested that the STB declare this litigation preempted under 49 U.S.C. § 10501(b). The STB did not definitively rule on this issue, but it stated that "at this point it is not clear that the court action would interfere with our exclusive jurisdiction over rail transportation, given [Norfolk Southern's] alleged consent to the parties' purported contractual arrangement." *See Norfolk S. Ry. Co.—Abandonment—In Beaufort County, NC*, 2005 WL 3308783 at *1.

Meanwhile, in the district court, after discovery was completed, PCS filed a motion for partial summary judgment on the breach of contract and breach of easement covenants claims, and Norfolk Southern filed a motion for summary judgment on all claims on the grounds that they were pre-

empted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501(b), and lacked merit in any event. On September 28, 2007, the court held that PCS's breach of contract, breach of covenants, and unjust enrichment claims were not preempted by the ICCTA, but the UDTPA claim was preempted. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705, 716-17 (E.D.N.C. 2007). On the merits of the remaining claims, the court held that PCS had established that Norfolk Southern was liable for breach of contract and breach of covenants, but PCS's unjust enrichment claim failed because it was simply a re-characterization of its other claims. *Id.* at 718-20. As an alternative to its holding that the UDTPA claim was preempted, the court also held that PCS's UDTPA claim failed on the merits because it too was simply a re-characterization of PCS's breach of agreement claims. *Id.* at 717-18.

Because the court could not determine the amount of Norfolk Southern's liability for breach of contract and breach of easement covenants on the summary judgment record, the court held a bench trial to determine damages on January 25, 2007. The court awarded a total of $18,790,893.90 in damages, which included $3,753,366.77 in prejudgment interest under N.C. Gen. Stat. § 24-5(a).

Both parties appeal. Norfolk Southern appeals the district court's liability finding, damages calculation, and holding that the breach of contract and breach of covenants claims were not preempted by the ICCTA. PCS appeals the district court's dismissal of its UDTPA claim on the merits and on preemption grounds.[1] We review the district court's rulings on summary judgment *de novo*. *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 299 (4th Cir. 2008). We review the court's conclusions of law at the bench trial *de novo* and its

---

[1]Because PCS does not appeal the district court's dismissal of its unjust enrichment claim, that claim is not before us.

factual findings there for clear error. *See Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005).

## II.

## A.

Norfolk Southern contends that PCS's claims for breach of contract and breach of easement covenants are preempted by the ICCTA. The Supreme Court has recognized that federal law can preempt state law expressly or by implication and that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Group, Inc. v. Good*, 129 S.Ct. 538, 543 (2008) (internal quotation marks omitted).

We first ask whether the ICCTA expressly preempts PCS's breach of agreement claims. The "plain wording" of the statute "necessarily contains the best evidence of Congress' preemptive intent," *see CSX Tansp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), but because an express preemption clause may not always "immediately end the inquiry," we also look to the statute's structure and purpose, *see Altria Group*, 129 S.Ct. at 543.

The ICCTA was passed in 1995 to terminate the Interstate Commerce Commission and replace it with the Surface Transportation Board. The "general jurisdiction" provision of the ICCTA states:

> The jurisdiction of the Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team,

switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, *the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law*.

49 U.S.C. § 10501(b) (emphasis added).

The express preemption clause focuses specifically on "regulation." *Id.* The STB's interpretation of this provision, on which courts rely, *see Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005), likewise focuses on the regulatory nature of the remedies preempted. *See CSX Transp., Inc.—Petition for Declaratory Order*, 2005 WL 1024490, at *2 (STB May 3, 2005) (one of two "broad categories" of actions preempted by § 10501(b) is "state or local regulation of matters directly regulated by the Board"). *See also Adrian & Blissfield Ry. Co. v. Vill. of Blissfield*, 550 F.3d 533, 540 (6th Cir. 2008) (quoting *CSX Transp., Inc.*); *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008) (same); *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir. 2007) (same). As the Eleventh Circuit put it, "Congress narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001) (quoting *Black's Law Dictionary* 1286 (6th ed. 1990)).

Voluntary agreements between private parties, however, are not presumptively regulatory acts, and we are doubtful that most private contracts constitute the sort of "regulation"

expressly preempted by the statute.[2] If contracts were by definition "regulation," then enforcement of every contract with "rail transportation" as its subject would be preempted as a state law remedy "with respect to regulation of rail transportation." 49 U.S.C. § 10501(b). Given the statutory definition of "transportation," this would include all voluntary agreements about "equipment of any kind related to the movement of passengers or property, or both, by rail." *See* 49 U.S.C. § 10102(9) (defining "transportation"). If enforcement of these agreements were preempted, the contracting parties' only recourse would be the "exclusive" ICCTA remedies. But the ICCTA does not include a general contract remedy.[3] Such a broad reading of the preemption clause would make it virtually impossible to conduct business, and Congress surely would have spoken more clearly, and not used the word "regulation," if it intended that result.

The history and purpose of the ICCTA support the view that Congress did not intend to preempt all voluntary agreements concerning rail transportation. The ICCTA was enacted in 1995 to deregulate the rail industry by eliminating direct economic regulation of railroads by the states. *See Fla. E. Coast Ry. Co.*, 266 F.3d at 1337-39. The legislative history reflects this purpose. Congressional reports note that

---

[2]The preemption text at issue here differs from the phrase "all other law" interpreted in *Norfolk and W. Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117 (1991), to include contractual obligations. The Court held that the exemption for mergers approved by the Interstate Commerce Commission from "the antitrust laws and all other law," under 49 U.S.C. § 11341(a) of the predecessor statute to the ICCTA included exemption from contractual obligations. *Id.* at 133. That section is now codified at 49 U.S.C. § 11321(a) and it is not at issue in this case. *See also Fla. E. Coast Ry. Co.*, 266 F.3d at 1331 (noting that § 10501(b) is narrower than the § 11341(a) "all other law" provision).

[3]49 U.S.C. § 11704 provides a cause of action for a person injured by a rail carrier that "does not obey an order of the Board," *id.* at § 11704(a), and for a person that is injured by "an act or omission of [a rail] carrier in violation of this part," *id.* at § 11704(b). Neither of these remedies would apply to breach of a private contract.

§ 10501(b) was meant to "clarify[ ] that the exclusivity is limited to remedies with respect to rail regulation—not State and Federal law generally," H.R. Conf. Rep. 104-422, at *167 (1995), *reprinted in* 1995 U.S.C.C.A.N. 850, 852, and "to reflect the direct and complete pre-emption of State *economic regulation* of railroads," H.R. Rep. 104-311, at *96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 807 (emphasis added). The Senate Committee Report notes that rail carriers "rely on a nationally uniform system of *economic regulation*" and that "[s]ubjecting rail carriers to *regulatory requirements* that vary among the States" would undermine the national rail service. S. Rep. 104-176, at *6 (1995) (emphases added). These discussions of § 10501(b), which did not mention voluntary agreements, suggest that such agreements do not fall into the core of economic regulation that the ICCTA was intended to preempt.

In examining a statute with a similar deregulatory purpose, the Supreme Court held that the Airline Deregulation Act did not preempt breach of contract claims. *See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). The language of the statute differs from the ICCTA, but the Court's reasoning only fortifies our skepticism about whether the ICCTA was intended to preempt all voluntary agreements about rail transportation. In explaining that a state does not "enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law" when it enforces "privately ordered obligations," the Court noted that the phrase "'law, rule, regulation, standard, or other provision' . . . connotes official government-imposed policies, not the terms of a private contract." *Id.* at 229 n.5 (internal quotations omitted). Here, although the word "regulation" is not used in precisely the same way, it also "connotes official government-imposed policies." The *Wolens* Court also noted that the phrase "'relating to rates, routes, or services' is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of an

air carrier." *Id.* (internal quotation marks omitted). Here, the express preemption provision only applies when the relationship between the remedy and rail transportation is one of "regulation." This relationship must be read, as it was in *Wolens*, in light of the Act's deregulatory purpose.

The STB itself has emphasized that courts, not the STB, are the proper forum for contract disputes, even when those contracts cover subjects that seem to fit within the definition of "rail transportation." *See, e.g.*, *The N. Y., Susquehanna & W. Ry. Corp.—Discontinuance of Service Exemption*, 2008 WL 4415853 (STB September 30, 2008) (rejecting stay based on claim that NYS&W did not fulfill contract obligation to "operate and maintain the [rail system] improvements" because "a court of competent jurisdiction is the proper forum to resolve contractual disputes, not the Board"); *Saginaw Bay S. Ry. Co.—Acquisition and Operation Exemption*, 2006 WL 1201791, at *2 (STB May 5, 2006) ("[W]hether SBS should be responsible for maintaining or indemnifying that portion of the line is a private contractual dispute subject to the terms of the agreement under which CSXT has made the assignment. . . contractual disputes such as this one are properly for the courts to decide."); *Morristown & Erie Ry., Inc.—Modified Rail Certificate*, 2004 WL 1387314, at *3 (STB June 22, 2004) (alleged breach of promise not to approve rail usage of a right-of-way without municipal permission did not constitute changed circumstance because "contractual disputes belong in court"). *See also* 49 U.S.C. § 10709(c)(2) (providing that contracts between rail carriers and shippers, which are not subject to rate requirements of the ICCTA, must be enforced in state or federal court).

In fact, when the STB reviewed Norfolk Southern's application to abandon the Lee Creek Line it implied that a court should determine whether Norfolk Southern is contractually liable for the relocation costs. The STB stated that the application was "premature and incomplete" because Norfolk Southern could "not claim relocation costs as a burden on

continued operation unless the court determines that it is obligated to pay to relocate the line." *See Norfolk S. Ry. Co.—Abandonment—In Beaufort County, NC*, 2005 WL 3308783, at \*1. The STB then noted that "there is ample time for the court to resolve the contractual dispute." *Id.*

We thus decline to view private contracts as presumptively regulatory. Whether "regulation" must always be by way of public rule is a question beyond the scope of this suit. In certain circumstances, courts have held that common law regulation through negligence and nuisance actions was preempted by the ICCTA. *See, e.g.*, *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir. 2001) (common law negligence claim was preempted "where that liability arises from a railroad's economic decisions such as those pertaining to train length, speed or scheduling"). But to interpret § 10501(b)'s preemption of "remedies with respect to regulation of rail transportation" as expressly preempting all voluntary agreements about "rail transportation," would go a step farther. That is a step Congress did not intend and we are not prepared to take.

## B.

Having concluded that enforcement of the relocation agreements is not expressly preempted, we move on to whether it is impliedly preempted. An express preemption clause does not bar a finding of implied preemption. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002). We apply the generally accepted test for ICCTA implied or conflict preemption: does the enforcement action "unreasonably interfer[e]" with rail transportation? *See CSX Transp., Inc.*, 2005 WL 1024490, at \*3; *see also Vill. of Blissfield*, 550 F.3d at 540 (6th Cir. 2008) (quoting *CSX Transp., Inc.*); *Barrois*, 533 F.3d at 332 (5th Cir. 2008) (same); *Emerson*, 503 F.3d at 1133 (10th Cir. 2007) (same); *N.Y. Susquehanna and W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3rd Cir. 2007) ("unreasonably burden rail carriage"); *Green Mountain R.R. Corp.*, 404 F.3d at 643 (2d

Cir. 2005) ("unduly interferes with interstate commerce" (quoting *Joint Petition for Declaratory Order–Boston and Me. Corp. and Town of Ayer*, 2001 WL 458685, at \*5 (STB May 1, 2001)). As courts have recognized, the determination of whether the action constitutes an "unreasonable interference" requires a factual assessment of the effect of providing the claimed remedy. *See, e.g.*, *Emerson*, 503 F.3d at 1133.

In this case, the factual assessment is simple because the remedy sought is enforcement of a voluntary agreement. The relocation agreements were freely negotiated between sophisticated business parties. The agreements envisioned this exact circumstance — that many years after the agreements were made, the railroad would have to pay to relocate this portion of the line. We can assume, therefore, that the agreements reflect a market calculation that the benefits of operating the rail line for many years would be worth the cost of paying to relocate the line in the future. In the context of the Commerce Clause, whether a particular regulation imposes an "unreasonable burden" on interstate commerce depends on whether the burden on interstate commerce imposed by the regulation outweighs the local benefits it provides. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In the context of voluntary agreements, we let the market do much of the work of the benefit-burden calculation.

As the STB has recognized, "voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce." *Township of Woodbridge v. Consolidated Rail Corp.*, 2000 WL 1771044, at \*3 (STB December 1, 2000); *see also Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co.*, 297 F. Supp. 2d 326, 332-33 (D. Me. 2003) (citing *Township of Woodbridge*). The STB has endorsed this view in other cases, *see, e.g.*, *Joint Petition for Declaratory Order–Boston and Me. Corp. and Town of Ayer*, 2001 WL 458685, at \*5, and even in its analysis of the relocation covenants at issue here. When the STB reviewed Norfolk South-

ern's application to abandon the Lee Creek Line, it cited *Township of Woodbridge* and stated that "at this point it is not clear that [this litigation] would interfere with our exclusive jurisdiction over rail transportation, given [Norfolk Southern's] alleged consent to the parties' purported contractual arrangement." *See Norfolk S. Ry. Co.—Abandonment—In Beaufort County, NC*, 2005 WL 3308783, at *1.

This approach to voluntary agreements is not an arbitrary or categorical distinction. Instead, it reflects the fact that market actors have incentives to enter into efficient arrangements. *See Wolens*, 513 U.S. at 230 (recognizing that enforcement of private agreements increases market efficiency). This is not to say that a voluntary agreement could never constitute an "unreasonable interference" with rail transportation, but the facts of this case indicate that any interference is not unreasonable —the parties contemplated delayed enforcement of the agreements, Norfolk Southern received the benefit of the agreements for over 40 years, and the agreements explicitly stated that the "relocation will not affect the ability of [Old NS] to comply with its legal obligation to serve any existing customer then on its line." In this instance, therefore, Norfolk Southern cannot use the ICCTA to "shield[ ] it from its own commitments." *See Township of Woodbridge*, 2000 WL 1771044, at *3.

## III.

We thus reject Norfolk Southern's preemption claims and turn to the merits. Norfolk Southern contends that it is not liable for breach of contract or breach of easement covenants because the covenants are not enforceable against it. It argues that the relocation covenants are personal covenants that only apply to the original covenanting parties, and the district court therefore erred when it held that the covenants bind Norfolk Southern as real covenants that run with the land. *See Runyon v. Paley*, 416 S.E.2d 177, 182-83 (N.C. 1992) (explaining difference between personal covenants and real covenants).

Under North Carolina law, a covenant is a real covenant that runs with the land if "(1) the subject of the covenant touches and concerns the land, (2) there is privity of estate between the party enforcing the covenant and the party against whom the covenant is being enforced, and (3) the original covenanting parties intended the benefits and the burdens of the covenant to run with the land." *Id.* at 183. Norfolk Southern only disputes the district court's application of the third prong of the *Runyon* test. It argues that the original covenanting parties did not intend the benefits and burdens of the covenants to run with the land.

We reject this argument because it ignores both the language and purpose of the agreement. The deeds of easement must be considered as a whole, *see Weyerhauser Co. v. Carolina Power & Light Co.*, 127 S.E.2d 539, 542 (N.C. 1962), and by their own terms, the deeds grant the easements to Old NS's "successors and assigns." The purpose of the deeds shows that the obligation to relocate the line was intended to last just as long as the easement itself. That purpose was two-fold: the deeds were intended to provide a right-of-way so that the rail line could be completed, but were also intended to preserve the value of the land by ensuring through covenants that the easements would not interfere with the mining of phosphate beneath the surface.

A covenant such as this, that protects the physical value of the land, is typical of a covenant that runs with the land. *See Runyon*, 416 S.E.2d at 187 ("[R]estrictions limiting the use of property to residential purposes have a significant impact on the value of neighboring land, and thus the very nature of such a restriction suggests that the parties intended that the restriction benefit land rather than the covenantee personally."). In order to protect this value for themselves, and for future mine owners because phosphate mining is by its nature a long-term enterprise, the original mine owners recorded the covenants in the deeds and filed them in the Register of Deeds for Beaufort County. In so doing, they put successors-in-

interest to the rail easements, such as Norfolk Southern, on notice that the covenants run with the land.

Norfolk Southern also argues variously that the covenants are not valid against Norfolk Southern because of the reasonable time restriction on contracts, the doctrine of laches, and the doctrine of changed circumstances. These doctrines do not apply. First, the reasonable time restriction on contracts does not bar enforcement of the covenants against Norfolk Southern because, as discussed, they were intended to be enforceable against subsequent landowners as real covenants in order to protect the long-term interest in mining. *See Rodin v. Merritt*, 268 S.E.2d 539, 544 (N.C. App. 1980) (determination of a reasonable time must take into account the purpose the parties intended to accomplish). Second, the doctrine of laches does not apply because PCS did not unreasonably delay in filing suit—once PCS confirmed the rail would need to be relocated it drafted a proposal and consulted with Norfolk Southern, and then when Norfolk Southern refused to pay for the relocation, PCS filed suit within six months. Finally, the doctrine of changed circumstances does not bar enforcement of the agreements because Norfolk Southern voluntarily agreed to the alleged changed circumstances. Norfolk Southern claims that the increased competition on the line has "destroyed the original bargain," but Norfolk Southern agreed that another carrier would be allowed on the line when it acquired Old NS in 1973.

We therefore conclude that the district court properly held that the relocation covenants were enforceable against Norfolk Southern as the successor-in-interest to the rail easements. *See Runyon*, 416 S.E.2d at 182-83 (real covenant is enforceable against owner of the land subject to the covenant). Norfolk Southern breached the covenants when it refused to pay to relocate the line in its letter of December 16, 2004. The district court properly held it liable.[4]

---

[4]PCS styled its claims for breach of the relocation agreements as both a breach of contract claim and a breach of easement covenants claim.

IV.

We next turn to Norfolk Southern's appeal of the district court's calculation of damages at the bench trial. First, Norfolk Southern argues that the district court incorrectly calculated compensatory damages because it included costs of portions of the line that were not necessary to replicate the old line and therefore gave PCS more than the benefit of its bargain. *See Wise*, 584 S.E.2d at 738 (for breach of a real covenant, "the measure of damages is the amount which will compensate the injured party for the loss which fulfillment of the contract could have prevented or the breach of it has entailed.") (quoting *Norwood v. Carter*, 87 S.E.2d 2, 4 (N.C. 1955)). This argument fails because the relocation covenants do not state that the new line must be identical to the old line —they state only that the new location for the line must avoid "excessive curvature, grade and distances." Perhaps Norfolk Southern would have designed the line differently had it relocated the track itself, or had it exercised its right to review the proposed design, but, as the district court found, it did neither. Nor did it object to the location or design of the relocated line at any time prior to this suit. It therefore cannot now complain that parts of the design were unnecessary.

Second, Norfolk Southern argues that the district court incorrectly applied North Carolina's prejudgment interest statute as of the date that Norfolk Southern breached the agreement rather than in stages based on the dates that PCS actually spent money constructing the relocated line. Norfolk

---

Without differentiating between the two, the district court held that Norfolk Southern was liable on both grounds. 520 F. Supp. 2d at 718-20. Norfolk Southern appeals, but also does not differentiate between the claims. Because we find that the district court properly held Norfolk Southern liable for breach of easement covenants, and the measure of damages is the same for both claims, *see Wise v. Harrington Grove Community Ass'n, Inc.*, 584 S.E.2d 731, 738 (N.C. 2003), we do not separately address the breach of contract claim.

Southern ignores the language of the statute which provides: "In an action for breach of contract . . . the amount awarded on the contract bears interest from the date of breach." N.C. Gen. Stat. 24-5(a). The district court followed the statute precisely. The court calculated prejudgment interest as of December 16, 2004, which is when Norfolk Southern informed PCS by letter that it would not relocate the line. We therefore affirm the court's calculation of damages.

V.

On cross-appeal, PCS argues that the district court erred by rejecting its UDTPA claim on the merits and by holding that its UDTPA claim was preempted by the ICCTA. In its complaint, PCS alleged that Norfolk Southern committed unfair and deceptive trade practices under N.C. Gen. Stat. 75-1.1 when it "willfully breached" its obligations under the relocation agreements and threatened to abandon the Lee Creek Line.

This claim is simply an attempt to multiply the damages for an ordinary breach of an agreement by re-characterizing the breach as a violation of the UDTPA. North Carolina law forbids this. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (collecting cases). It does not permit a party to transmute a breach of contract claim into a tort or UDTPA claim for extraordinary damages because awarding punitive or treble damages would destroy the parties' bargain and force the defendant to bear a risk it never took on. *See id.* at 346 (citing *Strum v. Exxon Co.*, 15 F.3d 327, 330 (4th Cir. 1994)). Recognizing this principle, "North Carolina courts have repeatedly held that 'a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UDTPA.]'" *Broussard*, 155 F.3d at 347 (quoting *Branch Banking & Trust Co. v. Thompson*, 418 S.E.2d 694, 700 (N.C. App. 1992)). Instead, under North Carolina law "a plaintiff must show substantial aggravating circumstances attending the breach" to

establish a UDTPA claim. *Branch Banking & Trust Co.*, 418 S.E.2d at 700 (quoting *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989)).

PCS attempts to show "substantial aggravating circumstances" by pointing to the fact that Norfolk Southern threatened to abandon the Lee Creek Line if PCS forced it to pay for the relocation. PCS argues that these statements were coercive because if Norfolk Southern had successfully abandoned the line, it would have cut off essential rail access to the mine. But these alleged threats are nothing more than Norfolk Southern stating that it believed it had a separate legal right to abandon its own tracks. The basis for PCS's claim therefore is nothing more than two companies fighting over the enforceability of an agreement. Although we hold that the agreement is enforceable, we will not re-write the parties' agreement by awarding treble damages for the breach thereof.[5]

Moreover, the relocation covenants are far from the reach of the UDTPA because they are wholly divorced from the context of consumer transactions. The UDTPA "was intended to benefit consumers," *see Dalton v. Camp*, 548 S.E.2d 704, 710 (N.C. 2001), but this dispute is between two sophisticated business entities: a rail carrier and a mine owner. By trying to

---

[5]Recognizing that an award of extraordinary damages re-writes a contract and destroys the voluntary nature of the agreement, courts have held that an award of extraordinary damages for a breach of contract can amount to preempted "regulation" within the meaning of § 10501(b). *See Pejepscot Indus. Park, Inc.*, 297 F. Supp. 2d at 333 (citing *S.D. ex rel. S.D. R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 934 (D.S.D. 2003)). In such instances, the reasons that counsel against finding that the ICCTA preempts voluntary agreements would no longer apply because awarding treble damages goes far beyond simply enforcing a voluntary agreement. Therefore, while the UDTPA is the sort of generally applicable law that the ICCTA was not intended to preempt, we recognize that in some instances its application might amount to precluded "regulation of rail transportation" or an "unreasonable interference" with rail transportation. Because the UDTPA claim here so clearly fails on the merits, we need not delve more deeply into the issue in this case.

characterize its breach of agreement claim as a UDTPA claim, PCS is trying to force what will not fit.

## VI.

At bottom, this case involves straightforward breach of covenant or contract claims. The carefully negotiated bargains that are at the center of these agreements drive our conclusions—Norfolk Southern cannot escape its obligation by disputing the parties' intent or hiding behind the ICCTA, but, just the same, PCS cannot enlarge the scope of Norfolk Southern's obligation by transforming a breach of covenant claim into a UDTPA action for treble damages and attorneys' fees. Instead, the parties must fulfill their contractual commitments—the law knows few more basic principles. For these reasons, we affirm the judgment.

*AFFIRMED*