Post v. Avita Drugs, LLC, 2017 NCBC 93.

STATE OF NORTH CAROLINA

ROWAN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 798

DAVID B. POST, Individually and as
Sellers' Representative,

        Plaintiff,

v.

AVITA DRUGS, LLC, a Louisiana
limited liability company,

        Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

1.    This dispute arises out of the sale of Plaintiff David Post's business, MedExpress Pharmacy, Ltd. ("MedExpress"), to Defendant Avita Drugs, LLC ("Avita") in 2014. Post contends that Avita breached the parties' Stock Purchase Agreement and, in doing so, committed unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1. Avita moves to dismiss the claim for unfair or deceptive trade practices pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Having considered the parties' filings and arguments, the Court **GRANTS** the motion to dismiss.

> *Robinson, Bradshaw & Hinson, P.A., by Edward F. Hennessey, IV and Adam K. Doerr, for Plaintiff.*
>
> *Moore & Van Allen PLLC, by Valecia M. McDowell and E. Taylor Stukes, and Andrews Kurth Kenyon LLP, by William J. Moore, for Defendant.*

Conrad, Judge.

## I.
## BACKGROUND

2. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. The following factual summary is drawn from relevant allegations in the complaint and the contract that is the subject of the complaint.

3. Formed in 2001, MedExpress is a "retail and specialty pharmacy serving customers both from its physical location and by delivery." (Compl. ¶¶ 1, 6, ECF No. 1.) MedExpress's rapid growth attracted a measure of publicity, and during 2013 and 2014, Post and MedExpress's two other shareholders entertained offers from Avita and a second bidder to purchase the company. (Compl. ¶¶ 6–10.) After Avita sweetened its offer, a deal was struck. (Compl. ¶¶ 11–13.)

4. In a Stock Purchase Agreement ("SPA") dated June 30, 2014, Avita acquired all outstanding shares of common stock in MedExpress. (*See* Compl. ¶ 18; Notice of Filing Ex. A, ECF No. 33 ["SPA"].) Avita agreed to pay more than $6 million in cash at closing plus a "deferred payment" of an "Earnout Amount" not to exceed $5.5 million. (Compl. ¶ 19; SPA §§ 2.01, 2.06(a)(vii), (d)(i).) The Earnout Amount, which is contingent on MedExpress's performance after the sale, is the subject of this litigation.

5. The formula for calculating the Earnout Amount is a simple equation: "six times (6x) the difference between: (a) Adjusted EBITDA; and (b) $925,000." (Compl. ¶ 21; SPA § 2.06(a)(vii).) Adjusted EBITDA, the key variable, is defined as MedExpress's "earnings from operations before interest, taxes, depreciation and amortization" during the one-year period after the sale, as calculated according to

Generally Accepted Accounting Principles and adjusted to exclude various enumerated amounts. (SPA § 2.06(a)(i).) Due to the multiplier, small variations in the Adjusted EBITDA calculation markedly affect the Earnout Amount: each dollar added to Adjusted EBITDA increases the Earnout Amount by six dollars, and each dollar subtracted takes six away.

6. Anticipating disagreements, the SPA laid out a process for calculating the Earnout Amount and resolving certain disputes. Avita was required to compute Adjusted EBITDA at the end of the one-year period and to provide a written explanation to Post. (SPA § 2.06(d)(i).) That calculation triggered a 30-day window for Post to lodge an objection, followed by a second 30-day period for negotiation to resolve the objection. (SPA § 2.06(d)(ii).) In the event of an impasse, the parties were to submit the "determination of Adjusted EBITDA" to an independent accountant for a "binding and conclusive" resolution. (SPA § 2.06(d)(ii).)

7. Each side also negotiated for substantive protections. Post retained the right to review MedExpress's financial reports on a monthly basis, (SPA § 2.06(c)(vii)), and he secured covenants in which Avita promised not to use its corporate control over the company to manipulate the performance metrics, (*see* Compl. ¶ 23). Among other things, Avita agreed to operate MedExpress "as a separate corporation," not to "intentionally divert any profitable business opportunity" to itself, and not to enter into transactions "with the primary intent of adversely affecting Adjusted EBITDA." (SPA § 2.06(e)(i)–(vi).)

8. For its part, Avita obtained indemnification rights against the selling shareholders. (SPA §§ 9.01, 9.02, 9.05.) And it reserved the "right to set-off against, or reduce the Earnout Amount by any damages resulting from" Post's breach of any representations and warranties in the SPA. (SPA § 9.07.)

9. Within a few months of the sale, Avita began exercising these rights. As early as September 2014, Avita asserted claims against Post under Sections 9.02 and 9.05 of the SPA. (*See* Compl. ¶ 24.) In July 2015, Avita notified Post that the amount of these claims could exceed the Earnout Amount. (*See* Compl. ¶ 28.) Post alleges that the claims were "spurious," "contrived," and designed to depress the Earnout Amount and to be used as "negotiating chips" in any dispute over its calculation. (Compl. ¶¶ 27–31.)

10. On August 14, 2015, Avita informed Post that it had calculated the Earnout Amount to be $1,542,283. (*See* Compl. ¶ 32.) Avita also stated that it would "hold back the Earnout Amount" pending its investigations of the claims asserted against Post. (Compl. ¶ 32.)

11. Post "timely objected to Avita's determination." (Compl. ¶ 33.) In response, Avita revised the Earnout Amount to $1,900,075—an amount that, though increased, did not satisfy Post's objections. (*See* Compl. ¶ 33.) Avita has not yet tendered any payment. (*See* Compl. ¶¶ 32–33.)

12. After acquiring the other shareholders' rights under the SPA, (*see* Compl. ¶ 20), Post filed this action on April 3, 2017. The complaint alleges numerous breaches of the SPA, alleges unfair or deceptive trade practices under N.C. Gen. Stat.

§ 75-1.1, and seeks a declaratory judgment as to the Earnout Amount. In short, Post asserts that Avita took a series of actions to depress the Adjusted EBITDA calculation, including using improper accounting practices, (Compl. ¶¶ 39–40); making retroactive adjustments to MedExpress's books and records, (Compl. ¶¶ 37–38); and failing to operate MedExpress as a separate company while transferring customers and contracts to itself, (*see* Compl. ¶ 41).

13. On June 29, 2017, Avita moved to dismiss the section 75-1.1 claim. On August 1, 2017, Post filed his response. During briefing, the parties also reached an agreement to submit certain disputes regarding the determination of Adjusted EBITDA to an independent accountant as required by the SPA.

14. The motion is fully briefed, and the Court held a hearing on August 16, 2017, at which all parties were represented by counsel. The motion is ripe for determination.

II.
ANALYSIS

15. Avita seeks to dismiss Post's claim for unfair or deceptive trade practices on two independent grounds. It argues, first, that the parties chose Delaware law to govern disputes arising out of the SPA, which bars Post from maintaining a section 75-1.1 action under North Carolina law. Post responds that Delaware law governs only the interpretation and enforcement of the SPA but North Carolina law governs related tort actions.

16. Avita's second argument is standard fare in North Carolina business litigation. It contends that, even if North Carolina law applies, Post has alleged only

a garden-variety breach of contract, which does not violate section 75-1.1. Post contends that, at the Rule 12(b)(6) stage, he has sufficiently alleged that the circumstances surrounding the breach include the type of egregious, deceptive conduct that gives rise to a claim under section 75-1.1.

17. The Court finds Avita's second argument persuasive. This action is, at its heart, a contract dispute. It is "best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 781 S.E.2d 889, 893 (N.C. Ct. App. 2016) (quoting *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623–24 (2001)). The Court therefore declines to decide the choice-of-law issue and concludes that, assuming North Carolina law applies, Post has failed to state a claim for unfair or deceptive trade practices.

A. <u>Legal Standard</u>

18. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). "Dismissal of a complaint under Rule 12(b)(6) is proper when one of the following three conditions is satisfied: (1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint on its face reveals the absence of fact sufficient to make a good claim; (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim." *Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).

19. In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the non-moving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). "[T]he court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001). In addition, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers," without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204, 652 S.E.2d 701, 707 (2007) (quoting *Oberlin Capital*, 147 N.C. App. at 60, 554 S.E.2d at 847).

## B. Section 75-1.1

20. To state a claim under section 75-1.1, a plaintiff must allege "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Capital Res., LLC v. Chelda, Inc.*, 223 N.C. App. 227, 239, 735 S.E.2d 203, 212 (2012). The statute, though broad, is "not intended to apply to all wrongs in a business setting." *Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001); *accord HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991).

21.    And yet section 75-1.1 claims are ubiquitous in North Carolina business litigation.  *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (characterizing section 75-1.1 as a "boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina" (citation omitted)).  In contract disputes, it is a commonplace for plaintiffs to pair a breach-of-contract claim with a section 75-1.1 claim.  *See, e.g.*, *Strategic Management Decisions, LLC v. Sales Performance Int'l, LLC*, 2017 NCBC LEXIS 69, at *8–9 (N.C. Super. Ct. Aug. 7, 2017); *Lendingtree, LLC v. Intercontinental Capital Grp., Inc.*, 2017 NCBC LEXIS 54, at *7–9 (N.C. Super. Ct. June 23, 2017); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *18–25 (N.C. Super. Ct. March 27, 2017); *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *13–19 (N.C. Super. Ct. Jan. 5, 2016).

22.    The reason is chiefly economic.  A successful section 75-1.1 claim entitles the plaintiff to treble damages and, in certain circumstances, reasonable attorney fees.  *See* N.C. Gen. Stat. §§ 75-16, 75-16.1.  These "powerful remedies," combined with an "open-ended" standard of conduct, vest plaintiffs with a potent and "credible threat that a 75-1.1 claim will succeed."  Matthew W. Sawchak & Kip D. Nelson, *Defining Unfairness in "Unfair Trade Practices"*, 90 N.C. L. Rev. 2033, 2034–35 (2012).

23.    By contrast, extraordinary damages are foreign to contract law.  "North Carolina follows the general rule that punitive or exemplary damages are not allowed for breach of contract."  *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976).  This is a sound and venerable rule, one that promotes

certainty in commercial contract negotiations. Businesses and individuals are free to focus on the value to be gained by commercial cooperation, rather than the pitfalls posed by legal wild cards. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996) ("Parties would be more reluctant to join in contractual relationships, or would expend more effort explicitly defining such relationships, if they faced the prospect of damages which could be out of proportion to the amounts involved in the contract.").

24. Because section 75-1.1 and contract law serve different purposes and rest on divergent remedial principles, section 75-1.1 "piggyback" claims are disfavored by North Carolina and federal courts alike. *Broussard*, 155 F.3d at 347; *Deltacom, Inc. v. Budget Telecom, Inc.*, No. 5:10-cv-38-FL, 2011 U.S. Dist. LEXIS 54488, at *12 (E.D.N.C. May 20, 2011). Courts strive to keep section 75-1.1 (along with its promise of extraordinary damages) within its proper legal bounds. A section 75-1.1 claim may not be based on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." *Broussard*, 155 F.3d at 347. Thus, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). There must exist "some type of *egregious* or *aggravating* circumstances" to invoke section 75-1.1. *Dalton*, 353 N.C. at 657, 548 S.E.2d at 711 (citation omitted); *see also Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 368, 533 S.E.2d 827, 833 (2000).

25. A classic example of an aggravating circumstance is deception "in the formation of the contract." *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989). A defendant's conduct may be actionably deceptive if it induced the plaintiff to enter a contract "when it did not intend to keep the promises made." *Custom Molders, Inc. v. Roper Corp.*, 101 N.C. App. 606, 614, 401 S.E.2d 96, 101 (1991); *see also, e.g.*, *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 196–97, 767 S.E.2d 374, 377–78 (2014); *Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Trust Co.*, 2015 NCBC LEXIS 36, at *39 (N.C. Super. Ct. Apr. 7, 2015). Likewise, "evidence of deliberate misrepresentations made by defendant during the formation of the contract" could be a sufficiently aggravating circumstance. *Williams v. Charlotte Copy Data, Inc.*, No. COA03-332, 2004 N.C. App. LEXIS 212, at *9 (N.C. Ct. App. 2003); *see also Int'l Designer Transitions, Inc. v. Faus Grp., Inc.*, 663 F. Supp. 2d 432, 448–49 (M.D.N.C. 2009) (fraud in the inducement "that pre-dated the execution of the Agreement"); *Baldine v. Furniture Comfort Corp.*, 956 F. Supp. 580, 587 (M.D.N.C. 1996) ("intentional misrepresentation made for the purpose of deceiving another").

26. It is far more difficult to allege and prove egregious circumstances *after* the formation of the contract. One reason for this is that disputes concerning the circumstances of the breach are often bound up with one party's exercise of perceived rights and remedies under the contract. Even where the exercise of contractual rights is "allegedly contrary to the terms of the agreement," the legal question concerns the interpretation and application of the agreement—that is, whether the contract has

been breached. *Taylor v. United States*, 89 F. Supp. 3d 766, 773 (E.D.N.C. 2014); *see also PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 224 (4th Cir. 2009); *Dew Elec., Inc. v. Mass Elec. Constr. Co.*, 3:09cv361-RJC-DCK, 2010 U.S. Dist. LEXIS 19904, at *11–12 (W.D.N.C. Mar. 5, 2010). These claims are "best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Heron Bay Acquisition*, 781 S.E.2d at 893 (quoting *Mitchell*, 148 N.C. App. at 75, 557 S.E.2d at 623–24).

27. Thus, the North Carolina Court of Appeals has repeatedly stressed that a section 75-1.1 violation "is unlikely to occur during the course of contractual performance." *Id.*; *accord Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006); *Mitchell*, 148 N.C. App. at 75, 557 S.E.2d at 624; *Eastover Ridge*, 139 N.C. App. at 368, 533 S.E.2d at 833. A party's "threats to terminate," "efforts to encourage" another to continue contractual performance while "planning to breach," and "refusal to otherwise meet" contractual obligations do not rise to the level of aggravating circumstances. *Deltacom*, 2011 U.S. Dist. LEXIS 54488, at *12–13; *see also Bartolomeo*, 889 F.2d at 534–36; *Kerry Bodenhamer Farms*, 2017 NCBC LEXIS 27, at *19–24; *Wellness Group, LLC v. King Bio, Inc.*, No. 1:12-cv-00281-MR-DLH, 2014 U.S. Dist. LEXIS 57239, at *16 (W.D.N.C. Apr. 24, 2014).

28. Only where the circumstances of the breach exhibit clear deception are they sufficiently egregious to impose section 75-1.1 liability. Examples include forging or destroying documents. *See Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115 (1993) ("defendant forged a bill of sale in an attempt to extinguish plaintiff's

ownership interest"); *N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs.*, 1:03CV00911, 2005 U.S. Dist. LEXIS 36308, at \*38–39 (M.D.N.C. Dec. 22, 2005) ("destruction of documents" could constitute "intentional action to mislead or deceive"). Similarly, the concealment of a breach combined with acts to "deter further investigation" may constitute aggravating circumstances. *Sparrow Sys. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at \*44 (N.C. Super. Ct. Dec. 24, 2014); *see also Lendingtree*, 2017 NCBC LEXIS 54, at \*8–9 (denying motion to dismiss where the defendant circumvented a "non-solicitation provision by directing its alter ego" to hire plaintiff's employees, "insisted" it did not employ those individuals, "and denied breaching the Agreement"); *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 465–66 (M.D.N.C. 2003) (denying summary judgment where defendant engaged in intentional deception for the purpose of "continu[ing] to reap the benefits of the Agreement").

29. Applying these principles, the Court concludes that Post has not sufficiently alleged egregious or aggravating circumstances attending the claimed breaches of the SPA. Post does not allege pre-contractual misrepresentations or that Avita entered into the SPA with the intent not to perform its obligations. Rather, the complaint makes clear that the alleged unfair or deceptive acts occurred "[a]fter the closing of the MedExpress transaction." (Compl. ¶ 53.)

30. The question is therefore whether this is the unusual case in which the circumstances of the breach itself are egregious and deceptive. It is not.

31.     Distilled to its essence, Post's argument is that Avita "manipulate[d] the numbers and contrive[d] spurious claims to depress or conceal" the Adjusted EBITDA calculation and the resulting Earnout Amount.  (Opp'n to Mot. Dismiss 14, ECF No. 19.)  According to Post, Avita asserted "spurious" claims against Post to reduce and delay the Earnout Amount; made "numerous improper accounting adjustments to manipulate earnings"; and misused its corporate control to charge Avita corporate overhead to MedExpress and transfer MedExpress contracts to Avita.  (Compl. ¶ 54.)

32.     Each of these alleged acts is the subject of express provisions of the SPA. The parties agreed to a detailed standard for calculating Adjusted EBITDA according to Generally Accepted Accounting Principles, along with a dispute resolution process that permitted Post to lodge an objection and to refer the matter to an independent accountant in the event of an impasse.  (*See* SPA § 2.06(a)(i), (d)(i)–(ii), (e)(vii).)  In fact, the independent accountant process is under way.  Whether Avita properly calculated Adjusted EBITDA requires no more than the routine interpretation and application of the SPA's terms and the completion of the dispute-resolution procedures negotiated and accepted by the parties.  *See Crescent Foods, Inc. v. Evason Pharms., Inc.*, 2016 NCBC LEXIS 76, at *28–29 (N.C. Super. Ct. Oct. 5, 2016).

33.     Likewise, the SPA expressly grants Avita the right to make claims against Post under sections 9.02 and 9.05 and, if successful, to set off those claims against the Earnout Amount.  (SPA § 9.07.)  Post insists that Avita's claims are contrived (and therefore egregious), but the complaint does not allege that any claim, even if false, had a *deceptive* quality.  Section 9.05 requires Avita to provide "such information and

documentation as may be reasonably requested by [Post] to support and verify the claim asserted." (SPA § 9.05.) The complaint does not indicate whether Post took advantage of the opportunity. To the extent he did, the complaint contains no allegation that Avita supplied falsified information in response. Accordingly, Avita's exercise of its perceived contractual rights, even if "allegedly contrary to the terms of the agreement," is not a substantial aggravating circumstance. *Taylor*, 89 F. Supp. 3d at 773.

34. So too for Avita's alleged misuse of its corporate control over MedExpress. Post negotiated for and obtained covenants in which Avita agreed not to take actions with the intent to reduce the Adjusted EBITDA calculation. (SPA § 2.06(e)(i)–(vi).) Taking the complaint's allegations as true, it appears that Avita intentionally breached these provisions. (*See* Compl. ¶¶ 37–38.) But even if Avita "breached a crystal-clear contract provision, an intentional breach is not unfair or deceptive." *Kerry Bodenhamer Farms*, 2017 NCBC LEXIS 27, at \*21 (citing *Branch Banking & Trust*, 107 N.C. App. at 62, 418 S.E.2d at 700). Furthermore, there is no allegation that Avita concealed its acts or took steps to deter Post from investigating the breaches, especially in view of Post's right to receive "monthly financial statements" until "the final determination of Adjusted EBITDA." (SPA § 2.06(e)(vii).)

35. The Court therefore concludes that the facts alleged in the complaint, even if proven, do not constitute an unfair or deceptive trade practice. *See Dalton*, 353 N.C. at 656, 548 S.E.2d at 711 ("The determination as to whether an act is unfair or deceptive is a question of law for the court."). By deferring calculation and payment

of the Earnout Amount, the parties opened the door to future disputes due to each party's incentives to maximize or minimize the Earnout Amount. The SPA is a detailed and sophisticated compromise on these points, including processes for dispute resolution and information rights to provide oversight and verification. These terms—and not section 75-1.1—define the parties' rights and obligations, as well as the remedies for the alleged breaches.

### III.
### CONCLUSION

36. For these reasons, the Court **GRANTS** the motion to dismiss. "The decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). Here, Post has not previously amended his complaint, and the possibility remains that new, materially relevant facts could come to light. Accordingly, his section 75-1.1 claim is dismissed without prejudice.


This the 11th day of October, 2017.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases